IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No.

ANTONIO TREY JONES, by and )
through his Guardian Ad Litem, )
CHARLES M. BRITTAIN III, )
  )
      Plaintiff, )
  )
      v. )              COMPLAINT
  )     (Jury Trial Demanded)
JAMES THORNTON, individually )
and in his official capacity; WILLIAM )
BRADY, individually and in his )
official capacity; ANDREW WORLEY, )
individually and in his official )
capacity; CHRISTOPHER GODWIN, )
individually and in his official )
capacity; SAMPSON COUNTY; and )
THE UNKNOWN SURETY of THE )
SAMPSON COUNTY SHERIFF'S )
DEPARTMENT, )
  )
      Defendants. )
_____ )

     NOW COMES Antonio Trey Jones, by and through his Guardian Ad Litem,

complaining of the Defendants and says:


## Introduction

     Antonio "Trey" Jones brings this action pursuant to 42 U.S.C. § 1983, for the

depravation of his civil rights under the Fourth, Fifth and Fourteenth Amendments

of Constitution of the United States of America, as well as other state claims.  In

2014, when Trey Jones was age fourteen, he was coerced by law enforcement to give

a false confession to the rape and murder of his 11-year-old neighbor, McKenzie Sessoms. Trey Jones spent five of the next seven years incarcerated awaiting trial in Sampson County, North Carolina, before the confession was suppressed by the court and the charges were dismissed. At all times relevant to this action Trey Jones suffered from an intellectual disability characterized by a Full-Scale I.Q. Score of 55 and significantly subaverage general intellectual functioning which was or should have been apparent to law enforcement. There is and never was any evidence connecting Trey Jones to the rape and murder of McKenzie Sessoms, his coerced confession was involuntary and not consistent with the facts or forensic evidence in the case, and DNA evidence exonerated Trey Jones.

The actions of the Defendants, as described more fully herein, deprived Trey Jones of his civil rights and constitutes shocking, malicious, and objectively unreasonable police misconduct, that proximately caused him years of unjustified incarceration, extreme emotional distress, loss of enjoyment of life and permanent damages.

### Jurisdiction, Parties & Venue

1. Antonio "Trey" Jones resides in Bladen County, North Carolina. He is 24 years old and suffers from a lifelong intellectual disability.

2. Charles M. Brittain III is a North Carolina attorney and the duly appointed Guardian Ad Litem for Plaintiff. Mr. Brittain's office is located in Cumberland County, North Carolina. Mr. Brittain was appointed Guardian Ad Litem by the Superior Court of Bladen County (23 CVS 660).

3. Defendant Sampson County is a political subdivision and county of the State of North Carolina, duly chartered and existing pursuant to the provisions of N.C. Gen. Stat. § 153A-11, including, but not limited to, the capacity to sue and be sued. At all times relevant to this action, Defendant Sampson County acted through its managers and policy makers, including the Sheriff of Sampson County, Defendant Jimmy Thornton, and other employees of the Sampson County Sheriff's Office; and the acts, edicts, and practices of said persons represent the official policies of Defendant Sampson County.

4. A substantial part of the events or omissions giving rise to the allegations in this complaint took place in Sampson County, North Carolina.

5. Defendant James H. Thornton (a/ka/ Jimmy Thornton) is a citizen and resident of Sampson County, North Carolina. Defendant Thornton is named in his official capacity as the chief law enforcement officer of Sampson County and the final policymaker for Sampson County for all purposes relevant to this Complaint. Under North Carolina law, the Sheriff is a county official and is the chief law enforcement official of the county, and the county's final policymaker for law enforcement purposes. At all times relevant to this Complaint, Thornton was acting under color of state law within the course of his employment. Defendant Thornton is also named in his individual capacity. Plaintiff seeks to recover against Defendant Thornton compensatory and punitive damages under state and federal law.

6. Upon information and belief, Defendant William Brady is a citizen and a resident of North Carolina. At all times relevant to this Complaint, Defendant

Brady was a special agent for the North Carolina State Bureau of Investigation and acted under color of state law within the course of his employment. Defendant Brady is named in this Complaint in his official and individual capacities and Plaintiff seeks to recover compensatory and punitive damages under state and federal law.

7.     Upon information and belief, Defendant Andrew Worley is a resident of North Carolina.   At all times relevant to this action, Defendant Worley was a detective for the Sampson County Sheriff's Department and acted under color of state law within the course of his employment.   Defendant Worley is named in this Complaint in his official and individual capacities and Plaintiff seeks to recover compensatory and punitive damages under state and federal law.

8.     Upon Information and belief, Defendant Christopher Godwin is a resident of North Carolina. At all times relevant to this action, Defendant Godwin was a detective with the Sampson County Sheriff's Department and acted under color of state law within the course of his employment.  Defendant Godwin is named in this Complaint in his official and individual capacities and Plaintiff seeks to recover compensatory and punitive damages under state and federal law.

9.     At all times relevant to this action, the acts and omissions of the Defendants were performed under the color of state law and constitute state action within the meaning of the Fourteenth Amendment of the Constitution of the United States of America.

10.     Upon information and belief, to the extent that any Defendant in this action claims they are a municipal, governmental, or a County owned, operated or

funded entity, or an employee or agent thereof, such Defendants do not have governmental or sovereign immunity for any of the acts or omissions described in this Complaint.

11.    In the alternative, should any Defendant in this action have governmental or sovereign immunity, upon information and belief, such Defendants have waived immunity for the civil liability alleged herein by the act of, without limitation, purchasing liability insurance, participating in a local governmental risk pool, or purchasing a surety bond.

12.    Upon information and belief, Defendant Jimmy Thornton purchased and maintained surety bond(s) pursuant to N.C. Gen. Stat. §§ 162-8 and 58-76-5, and by virtue of said surety bond(s) has undertaken to faithfully execute the office of Sheriff and perform all duties incumbent upon him by reason of his election to said office. Under North Carolina law, the Sheriff has waived governmental immunity by the purchase of his official bond.  Sheriff Defendants are directly liable to Plaintiff under Plaintiff's claim against the official bond as plead herein and derivatively liable to Plaintiff under Plaintiff's other causes of action as plead herein.

13.    The amount in controversy is in excess of $75,000.00.

14.    Jurisdiction and venue are proper in the Eastern District of North Carolina pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1391, et seq.

## Facts

### I.    Trey Jones Suffers from Mental Retardation and his Intellectual Disability Has Been Obvious and Apparent Throughout his Entire Life

15.     Antonio Trey Jones ("Trey") was born in the spring of 1999.  He is a polite and friendly young man who suffers from an intellectual disability and speech impediment.  Trey's intellectual disability and speech impediment manifested itself as early as age 4 and his limitations are obvious and apparent to any reasonable person who interacts with him.

16.     In today's terminology, Trey's disorder is known simply as an intellectual disability, but other terms that would capture the nature of Trey's limitations include, *mentally delayed*, *intellectual or developmental disorder*, *special needs*, or *an exceptional person*.   The term *mentally retarded* most accurately captures the nature and extent of Trey's disability, but usage of that term is disfavored so this Complaint uses the term intellectual disability.

17.     As early as Pre-kindergarten, Trey's intellectual disability and speech impediment were noticeable and apparent.  In August 2003, at age 4, Trey was placed in an Individualized Education Program at school to participate in speech therapy once per week.

18.     By May 10, 2004, at age 5, Trey's developmental delays are documented in a kindergarten Health Assessment Report when he enrolled in Sampson County Schools.   The assessment notes that Trey has developmental speech delays.  The assessment indicated that Trey was or should be receiving speech therapy in kindergarten.

19.     On December 15, 2006, at age 7, Trey underwent a psychological evaluation to assist in educational placement pursuant to a referral by his school. Mr.

Peter Crassweller, M.A., Licensed Psychological Associate, performed the psychological evaluation.

20.     Mr. Crassweller summarized the history of Trey's intellectual disability, noting *inter alia*, that Trey had a history of numerous delays, was found in previous evaluations to have low scores in reading and math, and noted that Trey's *communication skills* showed significant delay (emphasis added).

21.     Mr. Crassweller administered the *Wechsler Intelligence Scale for Children: 4th Ed.* (WISC-IV), which demonstrated that Trey had a Full-Scale IQ of 56. Trey's scores measured borderline or deficient in all areas but one.  Trey's verbal comprehension and reasoning scores were in the 1 percentile; his working memory score was in the 4 percentile; and processing speed was in the 0.2 percentile.

22.     Mr. Crassweller observed Trey to respond well to individualized attention but have difficulty sustaining focus and concentration.

23.     With regard to educational placement, Mr. Crassweller assessed that Trey was in the "mild" mentally deficient range of intelligence, that Trey would experience considerable difficulty with learning due to his *very low cognitive skills*, and that most of his test scores were deficient (emphasis added).  Mr. Crassweller concluded that Trey's intellectual disability would be an obstacle to consistent learning and that Trey would require a repetitive learning environment.

24.     On April 30, 2009, at age 9, Trey underwent a psychological evaluation by Jerry Miller, M.A., and Dr. Philip Hatfield, Ph.D., in connection with an

7

application for Supplemental Security Income benefits through the Social Security Administration.

25.     Mr. Miller observed Trey to be quiet and avoid eye contact.  Mr. Miller noted that Trey had poor hygiene and was unkempt.  Trey was observed to be distractible and to fidget in his seat.

26.     A speech impediment was noticeable and apparent.

27.      Mr. Miller stated he was unable to administer intelligence and achievement testing to Trey because of high levels of distractibility.  The examiner noted that Trey was disorganized, would abandon tasks quickly, and would randomly give irrelevant responses.

28.     On June 1, 2009, at age 10, Ms. Queesha Tillman, M. Ed., an Exceptional Children's Teacher at Salemburg Elementary School, completed a Teacher Questionnaire and Speech and Language Professional Report at the request of the North Carolina Office of Disability Determination Services in connection with Trey's application for social security disability benefits.

29.     Ms. Tillman documented functional deficits in Trey's ability to acquire and use information.  Ms. Tillman noted that Trey had serious problems with comprehending oral instructions, understanding school and content vocabulary, and applying problem-solving skills in class discussions.  Trey had very serious problems with written activities and obvious problems with learning new material and recalling previously learned material.

8

30.     Ms. Tillman documented functional deficits in Trey's ability to attend to and complete tasks.  Ms. Tillman noted that Trey had serious problems paying attention when spoken to directly, focusing long enough to finish assigned activities or tasks, refocusing, carrying out single-step and multi-step instructions, changing activities without being disruptive, completing work accurately without careless mistakes, completing assignments at all, working without distracting himself or others, and pacing himself.   Ms. Tillman noted that Trey will experience most of these functional deficits on an hourly basis each day.

31.     Ms. Tillman documented functional deficits in Trey's ability to interact and relate with others.  Ms. Tillman noted Trey had serious problems playing cooperatively with other children, making and keeping friends, seeking attention appropriately, following rules, and respecting or obeying adults in authority.

32.     Trey was noted to have obvious problems relating experiences and telling stories, using language appropriate to the situation and listener, introducing and maintaining relevant and appropriate topics of conversation, interpreting the meaning of facial expressions, body language, hints and sarcasm, and using adequate grammar and vocabulary to express thoughts or ideas in conversation.  Ms. Tillman noted that Trey encounters each of these functional deficits on a daily basis.

33.     In assessing Trey's independence, Ms. Tillman remarked that Trey spent his school day in a self-contained setting surrounded by special needs teachers and assistants.

34.     Ms. Tillman noted that Trey repeated Kindergarten and the 1st Grade.

9

35. Ms. Tillman identified Trey's educational disabilities as 1) Mental Retardation/Mentally Impaired/Intellectually Limited and 2) Speech or Language Impediment.

36. Ms. Tillman documented that only fifty-percent (50%) of Trey's speech was intelligible to unfamiliar listeners.

37. Ms. Tillman noted that only seventy-percent (70%) of Trey's speech was intelligible to familiar listeners, and that students in Trey's class were not always able to understand Trey when he was speaking.

38. Ms. Tillman believed that Trey's deficits in language and articulation skills impacted his ability to read, write and *orally communicate* in the classroom, and would interfere with his academic progress (emphasis added).

39. On June 25, 2009, Linda Trent Highsmith, M. Ed., a disability consultant for the Social Security Administration found that Trey's *speech impairment* medically equaled the disability listing because of marked limitations in his ability to acquire and use information and interact and relate with others.

40. By the time Trey was 10 years old, his intellectual disability had manifested itself in an obvious and immutable way such that it was apparent to any reasonable person that Trey had an intellectual disability.

41. From age 10 to age 14, Trey's intellectual disability was materially unchanged in that it was at all times obvious and immutable and was or should have been apparent to any reasonable person who interacted with Trey that he suffered from an intellectual disability.

42. In 2017 at age eighteen, Trey underwent a disability continuation review to determine if he would remain eligible for disability benefits under an adult standard.

43. On July 26, 2017, Trey underwent a psychological evaluation by Mr. Jeffery L. Hildreth, M.A., and Dr. Thomas B. Toy, Ph.D. Examiners administered the *Weschler Adult Intelligence Scale: 4th Ed.* (WAIS-IV), which demonstrated that Trey Jones had a Full-Scale IQ of Fifty-Five (FSIQ 55). The score was considered to be a valid and reliable assessment of Trey's intellectual functioning.

44. Mr. Hildreth observed that Trey exhibited multiple indicia of intellectual disability and documented that Trey appeared to get confused easily.

45. Mr. Hildreth opined that Trey would benefit highly from a "careful, comprehensive, coordinated and deliberate psychiatric diagnostic including socio-familial and neurological evaluations." Mr. Hildreth concluded that Trey had significant difficulties understanding and following instructions, that his ability to sustain attention was impaired, and that he would have difficulty relating with others.

46. On March 8, 2018, disability examiner Dr. Susan J. Skoll, Ph.D., found that Trey meets the Social Security Administration's criteria for Listing 12.05, *Intellectual Disorder*, due to marked limitations in multiple areas of mental functioning.

47. Dr. Skoll found that Trey's intellectual disability manifested itself consistently throughout his life. In support, Dr. Skoll noted that at the time of Trey's

11

disability review at age eighteen, Trey was not capable of living alone, was not allowed to cook, did not have a driver's license, did not go out alone, did not follow instructions well and could not handle money.

48. Trey's Full-Scale IQ from childhood to adulthood (56 and 55 respectively) place him in the low end of the "mild" range of intellectual disability, or the bottom 2% of the American population.

49. Trey Jones' intellectual disability is an obvious and immutable condition that is or should be apparent to any reasonable person who interacts with him.

50. Trey's speech impediment is an obvious and immutable condition that is or should be apparent to any reasonable person who interacts with him.

51. Trey Jones' marked limitations in his ability to interact and relate with others are obvious and immutable limitations that are or should be apparent to any reasonable person who interacts with him.

52. Trey Jones' marked limitations in his ability to acquire, use, and comprehend information are obvious and immutable limitations that are or should be apparent to any reasonable person who interacts with him.

## II. Trey Jones Makes a Non-Voluntary Inculpatory Statement to Law Enforcement About the Rape and Homicide of McKenzie Sessoms

### *May 5, 2014*

53. Trey Jones was age fourteen on May 5, 2014, when he answered the door for two law enforcement officers at his mother's home near the town of Louisburg, Franklin County, North Carolina.

54. McKenzie Sessoms was 11 years old when she was raped and murdered in her own home on September 6, 2013, in Salemburg, Sampson County, North Carolina. A more detailed description of the rape and murder of McKenzie Sessoms is discussed in Section VIII.

55. Eight months elapsed without an arrest between McKenzie's death and the interrogation of Trey Jones. During the intervening months, Trey moved from his father's residence in Sampson County (next door to McKenzie's house) to live at his mother's residence in Franklin County due to a custody agreement between his parents.

56. Special Agent William Brady of the North Carolina State Bureau of Investigation and Detective Andrew Worley of the Sampson County Sheriff's Department travelled more than 90 miles from Sampson County to Franklin County to interrogate Trey. The interrogation took place on the back deck of Trey's mother's home.

57. Investigators were acting on a tip they received from Austin Johnson a few days earlier. Austin (age 16) was McKenzie's cousin as well as Trey's schoolmate and one of the neighborhood children. In the summer of 2013 – about a month before the murder – Trey was asked to leave a swimming pool where Austin, McKenzie, and other cousins in the Sessoms family were playing. Austin told investigators that Trey got upset and began "talking shit" to Austin. Trey spouted off that he would "fuck McKenzie and your sister."

58. Brady and Worley travelled to Franklin County to confront Trey about the vulgar statements from nearly a year prior and whether he was responsible for McKenzie's death.

59. Brady and Worley allege that during the interrogation Trey volunteered an inculpatory statement (hereinafter "Trey's statement") admitting to the rape and murder of McKenzie.[1] By the end of the interrogation, Trey had suffered an emotional breakdown.

60. Brady and Worley treated Trey like an adult.

61. Brady and Worley never informed Trey or his mother that he was not required to speak with law enforcement.

62. Brady and Worley intentionally and purposely interrogated Trey without audio recording the interview. The only account of Trey's statement is the version of Brady and Worley.

63. At any point during the interrogation Brady and Worley could have activated a recording device but did not.

64. Brady and Worley never read *Miranda* warnings to Trey or his mother. Brady and Worley told Trey's mother they were investigating the death of McKenzie Sessoms, and they claim that Trey insisted on speaking with investigators alone – although that is disputed.

---

1. Each investigating officer (Special Agent William Brady, Detective Andrew Worley, Detective Christopher Godwin) testified under oath at a suppression hearing in the Superior Court of Sampson County on January 24, 2020, regarding many of the facts and allegations as described herein.

14

65.     Upon information and belief, Brady and Worley intentionally, with bad faith and malice, misled Trey's mother to believe that law enforcement intended for Trey to assist in the investigation because Trey had been friends with McKenzie.

66.     Brady and Worley never informed Trey or his mother that Trey would be questioned as a suspect.

67.     Upon information and belief, Trey was raised to trust and respect law enforcement.

68.     Brady and Worley conducted the interview in such a manner that Brady and Worley knew or should have known that their words and actions were reasonably likely to elicit an incriminating response from a child of Trey's age and intellectual ability.

69.     The length and substance of the interrogation, *inter alia* and without limitation, suggests that Brady and Worley intended to elicit an incriminating response from Trey.

70.     Upon information and belief, that Brady and Worley intentionally isolated Trey from his mother and other adults to conduct the interrogation without interference.

71.     Upon information and belief, Trey's mother attempted to include herself in the interrogation on multiple occasions but was deterred or discouraged from participating by Brady and Worley who insisted that Trey wanted to speak with law enforcement alone.

72.     Upon information and belief, Special Agent Brady directed Trey's mother to wait inside the house until the interrogation was over.

73.     At least one hour into the interrogation, Trey's mother requested that John Coleman, a man she identified as Trey's mentor, be allowed to observe the interrogation. Mr. Coleman was discouraged from observing the interrogation under intimidation by Special Agent Brady that doing so would make him a witness to a rape and homicide case. Mr. Coleman immediately left the area.

74.     Upon information and belief, as the interrogation progressed, Special Agent Brady moved his chair directly in front of Trey in such a manner as to frighten and panic a child of Trey's age and intellectual ability.

75.     Upon information and belief, Special Agent Brady leaned into Trey's face and accused him of being a liar. At or around such time, Trey started to become emotional and cry as he struggled to recall the memories and events of the previous summer.

76.     Trey repeatedly denied being responsible for McKenzie's death. Nonetheless, Brady and Worley accused Trey of having knowledge of the crime scene that only a person responsible for the crime could possess and bluntly and forthrightly accused Trey of killing McKenzie.

77.     Upon information and belief, Brady and Worley asked leading questions to Trey to cause him to admit to the sexual element of McKenzie's death. The words attributed to Trey about raping McKenzie are merely the words of Brady and Worley.

78. Upon information and belief, the graphic and sexually explicit subject matter on which Brady and Worley interrogated Trey contributed to Trey's emotional state, which Brady and Worley confused with signs of guilt or remorse.

79. At no point during the interrogation did Brady and Worley offer any breaks to Trey before beginning subsequent questioning.

80. Brady and Worley promised Trey that if he told the truth, he would not get in any trouble and Brady and Worley would leave the residence when the interrogation was over.

81. Brady and Worley interrogated Trey for over two hours and at no point did Trey leave the location of the interrogation. Trey was never left unattended. Brady and Worley never told Trey he was free to leave their presence.

82. Upon information and belief, Trey only confessed to the rape and murder of McKenzie to terminate the coercive interrogation by Brady and Worley.

83. Upon information and belief, Trey only confessed to the rape and murder of McKenzie to cause Brady and Worley to leave the Jones residence as they promised to do.

84. Upon information and belief, Trey only confessed to the rape and murder of McKenzie to reunite with his mother.

85. No child of Trey's age and intellectual ability would have felt free to leave the presence of Brady and Worley or know how to terminate the interview.

86. Trey had no prior dealings with Brady and Worley, did not initiate contact with them, and deferred entirely to their display of authority.

87.     Brady and Worley wore firearms during the interrogation.

88.     Brady and Worley arrived at the Jones residence unannounced in a marked Sampson County Sheriff's patrol vehicle.

89.     Trey recanted his statement prior to Brady and Worley departing the Jones residence.  Trey's mother immediately informed Detective Worley that Trey recanted his statement.  A woman identified in Special Agent Brady's notes as Trey's grandmother informed Special Agent Brady that Trey recanted his statement.

90.     Brady and Worley knew Trey recanted his statement but neglected or refused to follow up because Trey did not recant in their presence.

91.     Upon information and belief, Special Agent Brady did not want to hear Trey repudiate his statement because Brady decided already to charge Trey with McKenzie's death.

92.     Special Agent Brady never disclosed to lead Detective Godwin that Trey recanted his statement.

93.     Detective Worley never disclosed to lead Detective Godwin that Trey recanted his statement.

94.     It is alleged that, under the facts and circumstances, a two-hour interrogation of a child of Trey's age and intellectual ability without a parent or guardian present is undue and coercive such that Trey's statement to Brady and Worley was not voluntary.

95.     Even assuming *arguendo* that the testimony of Brady and Worley is accurate, a child of Trey's age and intellectual ability is incapable of consenting to be

18

interrogated in a rape and homicide investigation without his parent or guardian present.

96. Upon information and belief, Brady and Worley were on notice that engaging in a physically or psychologically coercive interrogation was reasonably likely lead to a false confession by a child of Trey's age and intellectual ability.

97. The mode and manner in which Brady and Worley conducted the interrogation of Trey was objectively unreasonable and it was reasonably foreseeable to them that proceeding in such a way may cause a child of Trey's age and intellectual ability to render a non-voluntary false confession.

98. Neither Trey nor his mother were adequately and effectively appraised of Trey's rights.

99. Investigators interviewed other juveniles to gather facts about McKenzie's death, including Dawson Pittman, Jerquawin Rich and Austin Johnson. Each interview was audio recorded and done in the presence of the juvenile's mother or another trusted adult.

100. Brady and Worley's failure to follow-up or inquire about Trey's recantation was objectively unreasonable under the circumstances and showed a reckless and deliberate indifference to Trey's civil rights.

101. Brady and Worley showed a reckless and deliberate indifference to the civil rights of Trey Jones by willfully and intentionally failing to audio record Trey's statement.

102.    Brady and Worley showed a reckless and deliberate indifference to the civil rights of Trey Jones by intentionally isolating Trey from his mother and other adults to conduct an interrogation.

103.    Brady and Worley showed a reckless and deliberate indifference to the civil rights of Trey Jones by interviewing him without his mother present.

104.    Brady and Worley showed a reckless and deliberate indifference to the civil rights of Trey Jones by willfully and intentionally failing to read *Miranda* warnings to Trey or his mother.

105.    The conduct of Brady and Worley caused Trey to suffer a depravation of his civil rights.

### III.    Trey Jones' Intellectual Disability Manifested Itself to Special Agent Brady and Detective Worley During the Interrogation and the Disability Was or Should Have Been Apparent to Them

106.    By May 2014, investigators learned that Trey and McKenzie were neighborhood friends.  Trey was known throughout the neighborhood for being mentally challenged and would play with neighborhood children who were younger than him, including McKenzie.

107.    During the interrogation, Trey disclosed to Brady and Worley that he was in special education classes at school.

108.    Trey's mother and family also informed Brady and Worley that Trey had special needs, epilepsy, and difficulty understanding things.

109. Notwithstanding Trey's admission that he was in special education classes, Brady and Worley allege that Trey appeared to be a normally functioning fourteen-year-old boy with no obvious or apparent delays.

110. At the suppression hearing in the Superior Court of Sampson County on January 24, 2020, Brady and Worley insisted that Trey was able to understand them and speak coherently with them to give a two-hour statement.

111. Special Agent Brady admitted that he noticed a "lisp" in Trey's speech during the statement. Detective Worley contended that Trey had no speech issues at all and communicated well for two hours.

112. Brady and Worley instructed Trey to illustrate a diagram depicting how and where he murdered McKenzie. Trey was confused by the request.

113. Upon information and belief, Trey struggled to recall memories and events that occurred 8-12 months prior to the interrogation and his intellectual disability was or should have been apparent to Brady and Worley. Instead of recognizing Trey's intellectual disability and mental limitations, Brady and Worley reacted by accusing Trey of being a liar and leading him to make a false confession.

114. Upon information and belief, Trey's well-documented low cognitive and oral communication skills manifested themselves to Brady and Worley during the two-hour interrogation and Trey's intellectual disability was or should have been apparent to them.

115.    Upon information and belief, Trey's marked deficits in interacting with others manifested themselves to Brady and Worley during the two-hour interrogation and Trey's intellectual disability was or should have been apparent to them.

116.    Upon information and belief, Trey's marked deficits in his ability to attend to and complete tasks manifested themselves to Brady and Worley during the two-hour interrogation and Trey's intellectual disability was or should have been apparent to them.

117.    Upon information and belief, Trey's marked deficits in his ability to use and comprehend information manifested themselves to Brady and Worley during the two-hour interrogation and Trey's intellectual disability was or should have been apparent to them.

118.    It is alleged that Trey's intellectual disability manifested itself to Brady and Worley when they instructed Trey – who was confused by the request – to draw a diagram of how and where he raped and murdered McKenzie, and that Trey's mental limitations were or should have been apparent to them.

119.    It is alleged that Trey's intellectual disability manifested itself to Brady and Worley when Trey demonstrated marked difficulty recalling remote events and Trey's disability was or should have been apparent to them.

120.    Throughout the two-hour interrogation Trey was emotional and crying because, upon information and belief, his intellectual disability impaired his ability to comprehend and process the circumstances in which he found himself.

22

121.   After Brady and Worley left the Jones residence, Trey was involuntarily committed to the emergency room at Franklin Memorial Medical Center by his mother for an emotional breakdown.

122.   Upon information and belief, Special Agent Brady's admission that he noticed a "lisp" in Trey's speech demonstrates that Trey's limitations in his ability to orally communicate, including deficits in language and articulation skills, were obvious and apparent to Brady.

123.   Upon information and Belief, if Special Agent Brady was able to detect the "lisp" in Trey's speech, he also was able to observe deficits in Trey's ability to comprehend information, such that Trey's intellectual disability was or should have been apparent to Brady.

124.   Detective Worley's testimony that Trey had no speech issues and communicated well for two hours is simply incredible and objectively inconsistent with Trey's entire life.

125.   Brady and Worley showed a reckless and deliberate indifference to the civil rights of Trey Jones by willfully and intentionally disregarding Trey's obvious and apparent intellectual disability.

126.   It was reasonably foreseeable to Brady and Worley that willfully and intentionally disregarding Trey's intellectual disability would cause a non-voluntary confession or otherwise deprive Trey of his civil rights.

127.   Brady and Worley's failure to observe or account for Trey's intellectual disability was objectively unreasonable under the circumstances and it was

reasonably foreseeable to Brady and Worley that their acts and omissions would cause Trey to suffer a deprivation of his civil rights.

128.    The acts and omissions of Brady and Worley as described in the preceding paragraphs caused Trey to suffer a deprivation of his civil rights.

### IV.    Trey Jones' Intellectual Disability Manifested Itself to Lead Detective Christopher Godwin and the Disability Was or Should Have Been Apparent to Godwin

#### *May 7, 2014*

129.    Soon after Brady and Worley's interrogation, Trey was arrested for the rape and murder of McKenzie Sessoms.  The timeline and sequence of events of Trey's arrest is described more fully below under subsequent headings.

130.    On May 7, 2014, at or around 1:53 A.M., lead detective Christopher Godwin attempted to conduct a custodial interview of Trey at the Sampson County Sheriff's Office.  The custodial interview lasted approximately 13 minutes and 7 seconds (13:07 min) and was audio recorded.

131.    Trey did not comprehend the information being relayed to him by Godwin and it was or should have been apparent to Godwin that Trey suffered from an intellectual disability.

132.    During the custodial interview Trey was confused about whether he was a "junior" or named after his father.

133.    Godwin attempted to read *Miranda* warnings to Trey, but Trey responded that he did not understand one or more of his rights.

134.    Referring to certain *Miranda* warnings, Godwin asked Trey "can you tell me what that means?" and "explain them to me," but Trey was unable to comprehend or explain the warnings.

135.    Godwin asked Trey to read the *Miranda* warnings out load and Trey responded, "I can't hardly read that good."

136.    Godwin asked Trey to initial and date the acknowledgement of his *Miranda* warnings, but Trey did not know how to write the date.  Godwin recognized that Trey wrote the date incoherently and dated the form himself.

137.    Trey misspelled his own first name as "Atonio" on the acknowledgement of rights form.

138.    Trey did not comprehend that he was under arrest for a criminal offense and asked Godwin, "Do I have to stay here?" near the conclusion of the custodial interview.

139.    Godwin attempted to explain to Trey in simple terms that the location of the juvenile detention center where Trey was to be held in custody was near Wilmington or "toward the beach."  Later, Trey asked if Detective Godwin was taking him to the beach.

140.    Upon information and belief, Trey's well-documented low cognitive and oral communication skills manifested themselves to Godwin during the 13-minute custodial interview and Trey's intellectual disability was or should have been apparent to Godwin.

141. Upon information and belief, Trey's marked deficits in interacting with others manifested themselves to Godwin during the 13-minute custodial interview and Trey's intellectual disability was or should have been apparent to Godwin.

142. Upon information and belief, Trey's marked deficits in his ability to attend to and complete tasks manifested themselves to Godwin during the 13-minute custodial interview and Trey's intellectual disability was or should have been apparent to Godwin.

143. Upon information and belief, Trey's marked deficits in his ability to use and comprehend information manifested themselves to Godwin during the 13-minute custodial interview and Trey's intellectual disability was or should have been apparent to Godwin.

144. Notwithstanding the above, at the suppression hearing in the Superior Court of Sampson County on January 24, 2020, Detective Godwin testified that Trey appeared to understand and comprehend his advice of rights "very well" and that Trey did not appear confused in any way.

145. Detective Godwin testified that Trey understood the circumstances in which he found himself. Godwin also testified that he did not detect any issue with Trey comprehending the custodial interview.

146. Detective Godwin's testimony that Trey had no difficulty understanding or comprehending his circumstances or his rights is incredible and objectively inconsistent with the audio recording of the custodial interview.

147.     Detective Godwin's testimony that Trey had no difficulty understanding the circumstances in which he found himself is incredible and inconsistent with the statements of other witnesses.

148.     Godwin showed a reckless and deliberate indifference to the civil rights of Trey Jones by willfully and intentionally disregarding Trey's obvious and apparent intellectual disability.

149.     It was reasonably foreseeable to Godwin that willfully and intentionally disregarding Trey's intellectual disability would cause a deprivation of Trey's civil rights.

150.     Upon information and belief, Detective Godwin never disclosed to anyone that Trey suffered from an obvious and apparent intellectual disability.

151.     Godwin's failure to observe or account for Trey's intellectual disability was objectively unreasonable under the circumstances and it was reasonably foreseeable to Godwin that his acts and omissions would cause Trey to suffer a deprivation of his civil rights.

152.     The acts and omissions of Godwin as described in the preceding paragraphs caused Trey to suffer a deprivation of his civil rights.

## V.     Trey Jones' Intellectual Disability was Obvious and Apparent to Other Individuals who Interacted with him

153.     Despite what Special Agent Brady, Detective Godwin and Detective Worley contend, other individuals who had the occasion to interact with Trey in 2014

and thereafter quickly and easily recognized that Trey suffered from an obvious and apparent intellectual disability.

154.     At the suppression hearing in the Superior Court of Sampson County on January 24, 2020, Adrain McLawhorn, a juvenile court counselor for Sampson County, testified that he presented Trey with a secure custody petition on or around May 6, 2014, and asked Trey several questions to conduct an assessment and determine the detention facility where Trey would be placed.

155.     Mr. McLawhorn testified that, immediately upon his initial interaction, he recognized Trey was "delayed" while asking a series of questions in "regular conversation."

156.     Mr. McLawhorn testified that Trey did not understand the situation he was in or the questions McLawhorn was asking him.

157.     Trey's intellectual disability was obvious and apparent to Superior Court Judge Henry L. Stevens IV at the suppression hearing in January 2020.

158.     In entering the Order suppressing Trey's statement to Brady and Worley, Judge Stevens found that Trey's "demeanor, speech and perceived general understanding" as observed by the court was consistent with the observations of Mr. McLawhorn that Trey was not "normal" as the detectives testified.

159.     Judge Stevens continued that it was "appreciable" to "this court several years later, that the defendant *exhibits noticeable signs* of being delayed." (emphasis added).

160.     In the same Order Judge Stevens found:

> "The Defendant is and was of lower intelligence and was noticeably "delayed" on May 7, 2014, and that mental delay should have been apparent to detectives on May 5, 2014."

161.    The only people who contend they were unable to recognize Trey's intellectual disability are law enforcement.

162.    On July 7, 2014 – two months after the arrest - Detective Godwin interviewed a neighborhood mom on Trey's street for fact gathering purposes, Ms. Theresa Esposito.  Ms. Esposito expressed doubt that Trey could have actually committed the crimes and explained that Trey was mentally delayed and suffered from epilepsy.  She continued, "the child can't hardly read at a first-grade book." Ironically, Ms. Esposito suggested that Trey may have provided a false confession.

163.    In a Raleigh News & Observer article dated September 9, 2017, the grandparents of McKenzie - on her mother's side - told a reporter of their doubts Trey committed the crimes, in part, because Trey was "a special education student" and suffers from epilepsy.

## VI.    The Investigation into Trey as a Suspect was Constitutionally Deficient

### A. Investigators Made no Effort to Deliberate Before Charging Trey

164.    Trey's statement to Brady and Worley concluded at approximately 5:30 P.M. on May 5, 2014.  An "Order For Secure Custody/Detention (AOC-J-440)" was issued *the same day*, indicating the decision to charge Trey with rape and murder was

reached *swiftly*. The language of the order says, "The juvenile is charged with a felony and has demonstrated that he or she is a danger to property or persons."

165.     The "Juvenile Petition" was sworn out and signed by both Godwin and Brady on May 6, 2014, less than twenty-four hours after Trey's statement.

166.     Godwin and Worley took trey into custody at Franklin Memorial Medical Center after discharge from his mental health admission.

167.     Brady and Godwin had obvious reason to doubt the accuracy of Trey's statement due to his intellectual disability and factual inconsistencies but proceeded without meaningful deliberation.

168.     It is alleged that Brady and Godwin recklessly and intentionally failed to deliberate, reflect, or otherwise exercise unhurried judgment in assessing the evidence in the case or in deciding whether it was justified to charge Trey with rape and murder.

169.     Upon information and belief, Brady and Godwin made the decision to charge Trey within hours of Trey's statement. At the suppression hearing in the Superior Court of Sampson County on January 24, 2020, Detective Godwin summarized the extent of their deliberations as:

> "Once Special Agent Brady returned, you know, from Louisburg, we had talked about it, had some discussions about charging the defendant, and we decided to take out a petition."

170.     Upon information and belief, Brady and Godwin made no effort to reflect or deliberate on several aspects of Trey's statement that were inconsistent with the factual and forensic evidence available to them at the time.

171.    Upon information and belief, Brady and Godwin made no effort to reflect or deliberate on how Trey's age and intellectual disability affected the veracity or voluntariness of his statement.

172.    It was reasonably foreseeable to Brady and Godwin that their failure to give due consideration to all the facts and circumstances would lead to the deprivation of Trey's civil rights.

173.    Brady and Godwin failed to act as reasonable and cautious officers during their deliberations and that failure constitutes objectively unreasonable police misconduct.

174.    The acts and omissions of Brady and Godwin as described in the preceding paragraph caused Trey to suffer a deprivation of his civil rights.

## B. Trey's Statement was Inconsistent with the Facts and Evidence Available to Investigators

175.    In entering the Order suppressing Trey's statement, Judge Stevens found that:

> "[Trey's] statements to detectives and his sister are woefully unreliable, incredible, and contradict most, if not all, of the objective evidence in this case."

176.    Brady and Worley contend – without imparting credibility to them - that Trey's statement included a detailed description of the offense, including that the crime occurred at 11:00 P.M.; that McKenzie's death was an accident; and that Trey held his hand over McKenzie's mouth for about a minute to prevent her from screaming and she died.

31

177.    Trey's statement included the verifiable claim that after committing the crimes he left McKenzie's house and went to his friend Dawson Pittman's (age 9) house to spend the night.  Two months after charging Trey - on July 7, 2014 - Detective Godwin discovered this part of Trey's statement to be false in an interview with Theresa Esposito as referenced in Paragraph 162 of this Complaint.

178.    The Medical Examiner Report was completed on or around September 20, 2013. From there forward, Brady and Godwin had access to the report documenting McKenzie's death with findings of forcible neck twisting and asphyxia.

179.    Upon information and belief, as the lead investigators of the case, Brady and Godwin were aware of the conclusions of the Medical Examiner Report.

180.    Trey's statement, as described by law enforcement, that he killed McKenzie by placing his hand over her mouth for a minute until she stopped breathing was inconsistent with the Medical Examiner Report that "the findings of asphyxia were not those of classic manual or ligature strangulation but trauma sustained to posterior neck suggests some element of neck twisting."

181.    Trey's statement that McKenzie's death was an accident was inconsistent with the conclusions of the Medical Examiner that McKenzie's manner of death was forcible and intentional.

182.    Trey's statement, as described by law enforcement, that he raped and murdered McKenzie by acts that were nearly simultaneous was inconsistent with the findings of the Medical Examiner Report that "the sexual element appears to have occurred within hours of the death but was not concurrent with the lethal activity."

183.    The Medical Examiner Report found that McKenzie had no foreign matter under her fingernails and was therefore inconsistent with the investigative theory detectives testified to that Trey may have suffered scratch injuries while raping and killing McKenzie.

184.    Trey's statement that McKenzie's death occurred at 11:00 P.M., is inconsistent with other information investigators learned in witness interviews. McKenzie's half-brother, William Lee Sessoms (also a person of interest in the case), told investigators he saw McKenzie asleep on the couch in the living room around midnight.

<u>Jessica Jones Statement</u>

185.    Brady and Worley further alleged that immediately after Trey's statement, they interrogated Trey's sister Jessica Jones (age 17).

186.    Jessica Jones' interrogation was not audio recorded.

187.    Jessica also suffers from an intellectual disability and the substance of her statement to Brady and Worley is disputed.

188.    Brady and Worley claim that Jessica told them that Trey told her that he (Trey) committed the murder. In fact, what Jessica told investigators was that Trey had a seizure disorder which caused memory problems and he didn't understand things.

189.    Upon information and belief, Brady and Worley asked leading questions to Jessica to elicit a response that Trey was responsible for McKenzie's death. Jessica repeatedly denied Brady and Worley's characterization of her statement, but Brady

33

and Worley accused her of not telling the truth. It should be noted that Jessica's interrogation was conducted at the same time Trey's aunt, mother and grandmother informed investigators that Trey recanted his statement.

190. Three or more members of the Jones family told Brady and Worley that Trey was not responsible for McKenzie's death, and that he had problems with comprehension, but Brady and Worley refused to hear it or re-engage Trey before leaving the Jones residence.

191. Neither Trey nor Jessica's alleged statements about when Trey went to bed were consistent with the timeline of the murder or time of death investigators had been working with for eight months.

192. Jessica's statement that McKenzie died by being suffocated with a pillow was not consistent with 1) Trey's statement or 2) the Medical Examiner Report documenting neck twisting with asphyxia.

193. Jessica's statement that McKenzie died by being suffocated with a pillow was not consistent with investigators' knowledge that McKenzie's death was caused by having her carotid artery crushed.

194. The only information Trey and Jessica gave investigators was the same rumors and gossip about McKenzie's death that had been circulating in the community and at school for eight months.

195. Superior Court Judge Henry Stevens ordered Trey's statement suppressed on evidentiary grounds due to its factual inaccuracy and "significant

indicia of **un**reliability" against all the other scientific and objective evidence in the case.[2]

### C. Investigators Failed to Disclose Significant and Material Exculpatory Facts of the Investigation

196.     Upon information and belief, that Brady, Worley, and Godwin intentionally and deliberately omitted or failed to disclose to the magistrate the above inconsistencies and other facts that tended to show Trey's statement was inconsistent with the evidence in the case.

197.     Upon information and belief, that Brady, Worley, and Godwin intentionally and deliberately omitted or failed to disclose to the Sampson County District Attorney the above inconsistencies and other facts that tended to show Trey's statement was inconsistent with the evidence in the case.

198.     It is alleged that Brady, Worley and Godwin intentionally and deliberately failed to disclose to the magistrate that Trey suffered from an obvious and apparent intellectual disability.

199.     It is alleged that Brady, Worley and Godwin intentionally and deliberately failed to disclose to the Sampson County District Attorney that Trey suffered from an obvious and apparent intellectual disability.

200.     Upon information and belief, Brady and Godwin did not provide the magistrate with a probable cause affidavit against Trey.

---

2.     The court presumed voluntariness of Trey's statement to make its ruling on evidentiary grounds.

201. Any reasonable officer in the shoes of Brady and Godwin would have entertained serious doubts about the accuracy of the information they provided to the magistrate due to Trey's age, intellectual ability and factual inconsistencies.

202. Trey's statement and description of McKenzie's death was in direct contradiction to nearly all of the scientific and objective evidence available to investigators at the time and they never disclosed the discrepancies to anyone.

203. It is alleged that Brady, Worley and Godwin showed a reckless and deliberate indifference to the constitutional rights of Trey Jones by willfully and intentionally disregarding, concealing or failing to disclose the significant and material exculpatory aspects of Trey's statement that were not consistent with the forensic evidence or the facts of the case.

204. Brady, Worley and Godwin's failure disclose the significant and material exculpatory aspects of Trey's statement was objectively unreasonable, and it was reasonably foreseeable that doing so or omitting to do so would cause a depravation of Trey's civil rights.

205. The acts and omissions of Brady, Worley and Godwin as described in the preceding paragraphs caused Trey to suffer a depravation of his civil rights.

### D. Investigators Were Not Trained to Interrogate a Juvenile

206. Upon information and belief, at all times relevant to this action, Special Agent Brady had never undergone any training specific to juvenile interrogations or completed any coursework or curriculum on juvenile rights. As a consequence,

Special Agent Brady was not adequately trained or instructed on the proper and appropriate way to conduct a juvenile interrogation or how to guard juvenile rights.

207.	Special Agent Brady testified to his inadequate training during the suppression hearing in the Superior Court of Sampson County on January 24, 2020.

208.	At all times relevant to this action, Detective Worley had never undergone any training specific to juvenile interrogations or successfully completed any coursework or curriculum on juvenile rights. As a consequence, Detective Worley was not adequately trained or instructed on the proper and appropriate way to conduct a juvenile interrogation or how to guard juvenile rights.

209.	Detective Worley testified to his lack of training during the suppression hearing in the Superior Court of Sampson County on January 24, 2020.

210.	Upon information and belief, it was reasonably foreseeable that sending Brady and Worley to interrogate Trey without proper and adequate training on juvenile rights would lead to the depravation of Trey's civil rights.

211.	Juvenile suspects, including those with intellectual disabilities, are the type of suspects with whom it is reasonably foreseeable that law enforcement must interact.

212.	Upon information and belief, at all times relevant to this action, Sampson County and/or Sampson County Sheriff's Department's acts and omissions with respect to training and supervision constituted a policy or custom of deliberate indifference to juvenile rights.

213.     It is alleged that Sampson County and/or the Sampson County Sheriff's Department's failure to properly and adequately train officers to conduct juvenile interrogations is inconsistent with nationally recognized and generally accepted standards of practice that direct the same to avoid constitutional injury.

214.     Sampson County and/or the Sampson County Sheriff's Department's policies, customs, training, and supervision with regard to juvenile rights was so obviously insufficient that Sampson County and/or the Sampson County Sheriff's Department was or should have been on notice that without additional training a constitutional violation against a juvenile was likely to occur.

215.     It is alleged that Sampson County and/or the Sampson County Sheriff's Department's policy or custom of deliberate indifference to juvenile rights caused Trey to suffer a depravation of his constitutional rights.

216.      Sampson County and/or the Sampson County Sheriff's Department, by their acts and omissions with respect to training and supervision, showed a deliberate indifference to the rights of Trey Jones and all other juvenile residents of Sampson County.

217.     Upon information and belief, at all times relevant to this action, the North Carolina State Bureau of Investigation's acts and omissions with respect to training and supervision constituted a policy or custom of deliberate indifference to juvenile rights.

218.     It is alleged that the State Bureau of Investigation's failure to properly and adequately train officers to conduct juvenile interrogations is inconsistent with

nationally recognized and generally accepted standards of practice that direct the same to avoid constitutional injury.

219.    The State Bureau of Investigation's policies, customs, training, and supervision with regard to juvenile rights was so obviously insufficient that the agency was or should have been on notice that without additional training a constitutional violation against a juvenile was likely to occur.

220.    It is alleged that the State Bureau of Investigation's policy or custom of deliberate indifference to juvenile rights caused Trey to suffer a depravation of his constitutional rights.

221.    The State Bureau of Investigation, by their acts and omissions with respect to training and supervision, showed a deliberate indifference to the rights of Trey Jones and all other juvenile residents of North Carolina.

222.    To the extent any defendant avers that the State Bureau of Investigation had in place written policies and training materials for juveniles that comply with the constitution and case law, upon information and belief, Special Agent Brady appears to have received inadequate training and supervision therein.

223.    Upon information and belief, Sheriff Thornton is a county official and the final policy maker for Sampson County and/or the Sampson County Sheriff's Department and was deliberately indifferent to his department's lack of training and supervision with respect to juvenile rights and the potential for the risk of harm associated therewith.

224. Upon information and belief, Sheriff Jimmy Thornton ratified the misconduct of Special Agent Brady, Detective Worley and Detective Godwin when he, without limitation, appeared alongside investigators at a press conference and uttered false and misleading statements about the evidence against Trey Jones. The press conference is discussed more fully below.

## VII. Jimmy Thornton Uttered or Repeated False and Misleading Statements about the Evidence Against Trey Jones

225. Upon information and belief, on or around May 7, 2014, Sheriff Jimmy Thornton organized a press conference attended by multiple media outlets to announce the rape and murder charges against Trey. There, Thornton made malicious, knowingly false, and misleading statements to the press and the public about DNA evidence to suggest the case against Trey was stronger than it was.

226. The false and misleading statements made by Thornton and the Sampson County Sheriff's Department were made intentionally and with knowledge of their falsity or reckless disregard of whether the statements were false.

227. The press conference was attended by investigative journalist Nicole Carr of ABC 11 Eyewitness News (WTVD-TV Raleigh-Durham), who reported that "The Sampson County sheriff said they have DNA evidence linking Jones to the crime."

228. Thornton's claim that there was DNA evidence linking Trey to the rape and murder of McKenzie was false, never true, and Thornton knew or should have known of its falsity. As discussed more fully below, the North Carolina State

Laboratory did not begin returning DNA lab results to the Sampson County Sheriff until the Spring of 2017.

229.     The press conference was attended by news reporter Gilbert Baez of WRAL News (WRAL-TV Raleigh-Durham-Fayetteville), who reported that investigators "us[ed] DNA to finally make an arrest." Thornton's claim was intentionally false and misleading.

230.     News of the charges was announced by The Daily Mail in the United Kingdom on May 8, 2014, where it was reported that "Authorities said they arrested the suspect after using DNA evidence to match him to the crime." Thornton's claim was intentionally false and misleading.

231.     The charges were announced by a news outlet in Australia on May 9, 2014, where it was reported that "Armed with DNA evidence," Trey was arrested for the rape and murder of McKenzie Sessoms. Notably, the article concluded by acknowledging that Trey "protested his innocence after being interviewed by police." Thornton's claim about DNA evidence was intentionally false and misleading.

232.     On September 8, 2017, WRAL News reported on the case again and reiterated: "[T]he Sampson County Sheriff's Office arrested Antonio Trey Jones, who was 14 at the time, citing DNA evidence and exhaustive interviews."

233.     Sheriff Thornton uttered other false statements about the strength of the case against Trey Jones. On or around June 8, 2021, Sheriff Thornton made a statement to WRAL News commenting on the decision by the Sampson County District Attorney to dismiss the charges against Trey. Sheriff Thornton told WRAL

News, "there is no evidence so far that links anyone else to the case." Thornton's claim that there is no evidence linking anyone else to the crime was misleading, demonstrably false and reckless.

234. The repeated false and misleading statements uttered by Sheriff Thornton to multiple media outlets throughout the entirety of Trey's ordeal were shocking, unconscionable, malicious, sadistic and evidence a reckless and callous disregard for, and deliberate indifference to, Trey's civil rights.

235. Sheriff Thornton's shocking and malicious false claims were uttered in the course and scope of his employment as the elected Sheriff of Sampson County and under color of state law.

236. Upon information and belief, Defendants Brady, Godwin, and Worley each attended the press conference and stood alongside the other as Sheriff Thornton uttered the false and misleading statements, which each defendant knew or should have known were false by virtue of their involvement in the case as investigators. At no point did any defendant intervene to correct the false and misleading statements uttered against Trey.

237. Such a failure to intervene or correct the misleading statements is evidence of malice, wanton disregard, reckless and deliberate indifference, and a callous disregard for Trey's civil rights by all defendants.

* * * * *

238.     The criminal proceedings initiated against Trey finally terminated in his favor on March 11, 2021, when all charges pending against him were voluntarily dismissed by the district attorney (14CRS726 – Sampson County).

239.     Trey's agony lasted 6 years, 10 months and 6 days.

240.     Trey contemplated suicide while incarcerated, engaged in self-harming behavior, was assaulted by other inmates, and was the victim of severe bullying. One inmate attempted to force Trey to eat feces and drink urine.

241.     As a direct and foreseeable consequence of the defendants' egregious and malicious misconduct, Trey Jones was, without limitation, unreasonably and unlawfully subjected to criminal prosecution, emotional distress, and approximately 7 years of incarceration or loss of liberty. An exact count of the number of days Trey spent in confinement will be produced in later filings.

242.     Sheriff Thornton by his acts and omissions materially contributed to and caused the deprivation of Trey's civil rights.

243.     It is further alleged that Sheriff Thornton ratified the misconduct of the other defendants in this action and caused the deprivation of Trey's civil rights.

## VIII. The Investigation into the Rape and Homicide of McKenzie Sessoms

> *"[Trey's] statements to detectives and his sister are woefully unreliable, incredible, and contradict most, if not all, of the objective evidence in this case."*

244.     On September 6, 2013, McKenzie Sessoms, age 11, was raped and murdered in her own home in Sampson County. The investigation revealed that

around 6:50 AM on September 6, 2013, McKenzie was found dead on a couch in the living room by her father when he went to wake her up for school.

245.     McKenzie lived in a mobile home with her father Donnie Ray Sessoms, and two half-brothers, Ray Sessoms and William Lee Sessoms.  At the time of the offense, Donnie Ray Sessoms was age 54, Ray Sessoms was age 29, and William Lee Sessoms was age 25.

246.     Investigators determined that on the night of the murder, a school night, the Sessoms brothers were drinking and had invited guests over to their garage for some type of gathering that ended well after McKenzie went to bed.

247.     Initially, investigators focused on McKenzie's immediate male relatives with whom she lived.  Donnie Ray Sessoms, Ray Sessoms, and William Lee Sessoms each consented to give DNA samples and were interviewed.

248.     Investigators had reason to believe McKenzie's oldest half-brother, Ray Sessoms (age 29), was a person of interest because it was determined he lied to investigators about his activities and behavior the night of the murder.  Ray Sessoms initially told investigators he went to bed early and awoke first thing in the morning to his father's discovery of McKenzie's body.  In fact, cell phone records revealed Ray Sessoms was awake until the early hours of the morning texting women for sex and another individual to purchase drugs – around the time McKenzie was believed to have been raped and killed.

249.     Several people investigators interviewed believed Ray Sessoms was responsible for McKenzie's death because of his criminal record and reputation,

among other things. Rays Sessoms admitted to investigators that he Google searched why a detective would need a DNA sample. Ray Sessoms was rumored to have gone to a neighbor's house to shower around the time evidence technicians processed the crime scene for forensics.

250. Investigators also had reason to suspect that Ray Sessoms' drug dealer, Alan Campos was a person of interest. Campos lied to investigators about knowing Ray Sessoms and texting him late on the night/morning of McKenzie's death. Campos allowed Detective Godwin to look at his phone and Godwin discovered that Campos deleted text messages between himself and Ray Sessoms from the night McKenzie died. Investigators never collected hair or DNA samples from Campos.

251. Investigators had reason to believe McKenzie's younger half-brother, William Lee Sessoms (age 25), was a person of interest because it was learned that he typically slept on a couch in the living room next to McKenzie, or in McKenzie's bed when McKenzie slept on the living room couch. That night, he stayed up drinking until midnight in the garage with associates. William Lee and his associates then left the residence around midnight. William Lee stated that he went inside the house before leaving and McKenzie appeared to be asleep. William Lee was purportedly the last person to see McKenzie alive.

252. Investigators also considered McKenzie's father, Donnie Ray Sessoms, as a person of interest but do not seem to have seriously considered him as a suspect. Just a few months before the murder, Donnie Ray spent thousands of dollars on

attorney's fees to regain custody of McKenzie. He was regarded as a caring father and was credited with helping McKenzie get back on track at school.

253.     Investigators attempted to identify and interview the people who attended the Sessoms brothers' gathering in the garage. Estimates of how many people were there ranged from 5-6 to 10-20 people. Every person investigators interviewed denied knowledge of or involvement in McKenzie's death. Many repeated rumors and gossip about how McKenzie died.

254.     It was a known and well-discussed fact in the community that McKenzie was raped and murdered on the couch in her living room. The location of her body and other details were included in the initial news reports about her death.

255.     Months elapsed as the case went unsolved. In the spring of 2014, investigators were still awaiting DNA analysis to be returned from the state lab and investigators faced increasing pressure from McKenzie's grandparents on her mother's side to solve the case.

256.     Investigators learned that McKenzie's aunt erected a swimming pool in the summer of 2013. McKenzie in particular enjoyed swimming with her cousins who were known to play in the pool daily in the summer. McKenzie's aunt's house was walking distance to her father's house and McKenzie would spend her afternoons there after school until her father got off work.

257.     On or around April 30, 2014, Detective Godwin and Special Agent Brady received a tip from Austin Johnson (age 16) and his mother Penchealea Jacobs. Austin was McKenzie's cousin and Ms. Jacobs was McKenzie's aunt on the paternal

(Sessoms) side of the family. The interview was audio recorded, and for reasons unknown to Plaintiff, the questioning focused on Trey. Penchealea Jacobs knew the Jones family well and appeared to express an acute rancor against Trey and his family.

258. Detective Godwin asked leading questions to Austin to elicit disparaging remarks about Trey. Austin and Ms. Jacobs told investigators that Trey wasn't "right in the head," had a history of violence, had been "caught peeping" on McKenzie at the pool a couple of months before her death, and had made vulgar comments to Austin about McKenzie as discussed in Paragraph 57 of this Complaint. Penchealea Jacobs claimed that Trey had a history of committing incestuous sexual acts on his own sister.

259. Based on the inuendo and disparaging remarks offered by McKenzie's family, Special Agent Brady and Detective Worley travelled to Louisburg five days later to interrogate Trey. As pled herein, Trey suffered from an intellectual disability and provided investigators with a confession inspired by rumors and gossip that contradicted nearly all the factual and forensic evidence available to investigators at the time, yet he was charged anyway.

260. Beginning in April 2017 and continuing thereafter, DNA lab results were returned to investigators. The analysis showed that saliva collected from McKenzie's vagina excluded Trey Jones. The saliva came from a male contributor, but the lab was unable to link the sample to any particular person. Instead, the

analysis only showed the saliva was a match to her paternal lineage (i.e., her father or two half-brothers – with whom she lived).

261.      Separately, DNA samples collected from McKenzie's underwear and t-shirt yielded multiple male contributors.  The dominant profile again excluded Trey Jones and matched her paternal lineage (Donnie Ray, Ray *or* William Lee).  A minor profile was of insufficient quantity to analyze.

262.      Upon information and belief, the North Carolina State Laboratory issued nine (9) separate reports for forensic DNA analysis.  None of the analysis implicated Trey in any way and most, if not all, of the reports conclusively excluded Trey.

263.      The rape and murder of McKenzie Sessoms remains unsolved.

264.      Investigators in the case would continue to insist that there has never been any evidence linking anyone else other than Trey Jones to this crime, which is patently false.   In fact, there is not and has never been any evidence that links Trey Jones to this crime *whatsoever*.  Investigators would continue to insist that Trey's confession matched the crime scene, and that he did not appear to suffer from an intellectual disability.

## <u>Count One</u>
## False Arrest and Imprisonment
## against Thornton, Godwin, Worley and Brady
## (North Carolina Law)

265.      Each and every paragraph of this Complaint is hereby realleged and incorporated by reference as if fully set forth herein.

266.     At all times mentioned herein, Defendants Jimmy Thornton, Christopher Godwin, Andrew Worley and William Brady acted under the color of law as law enforcement agents of the Sampson County Sheriff's Department or the North Carolina State Bureau of Investigation, and with the authority of the Sampson County Sheriff's Department and the North Carolina State Bureau of Investigation.

267.     On or around May 6, 2014, Defendants Jimmy Thornton, Christopher Godwin, Andrew Worley and William Brady placed Plaintiff Antonio Trey Jones under arrest without any probable cause that Plaintiff had committed a criminal offense.

268.     Plaintiff's arrest was accomplished by coercion and investigators' willful failure to disclose exculpatory information to the district attorney and the North Carolina courts.

269.     As a result of the aforesaid conduct of Defendants Jimmy Thornton, Christopher Godwin, Andrew Worley and William Brady, each acting in concert with and aiding each other, Plaintiff Antonio Trey Jones was subjected to an illegal, improper and false arrest by said Defendants and taken into custody and caused to be jailed, falsely imprisoned, detained, and confined, without any probable cause, privilege or consent.

270.     The deprivation of Plaintiff Antonio Trey Jones' liberty as a result of Defendants' acts and omissions continued from May 6, 2014, until the charges against Plaintiff were dismissed on March 11, 2021.

271.     The Defendants are jointly and severally liable for the false arrest and imprisonment of the Plaintiff by Defendants Jimmy Thornton, Christopher Godwin, Andrew Worley and William Brady, which proximately caused the damages to Plaintiff in an amount in excess of $75,000.00, to be determined by a jury.

### Count Two
### Malicious Prosecution
### against Thornton, Godwin, Worley and Brady
### (42 U.S.C. 1983)

272.     Each and every paragraph of this Complaint is hereby realleged and incorporated by reference as if fully set forth herein.

273.     Defendants Jimmy Thornton, Christopher Godwin, Andrew Worley and William Brady instituted criminal proceedings or caused criminal proceedings to be instituted against Plaintiff.

274.     When instituting criminal proceedings or causing criminal proceedings to be instituted against Plaintiff, Defendants Jimmy Thornton, Christopher Godwin, Andrew Worley and William Brady, acted with express, actual and/or implied malice.

275.     When instituting criminal proceedings or causing criminal proceedings to be instituted against Plaintiff, Defendants Jimmy Thornton, Christopher Godwin, Andrew Worley and William Brady acted without probable cause that Plaintiff had committed a criminal offense.

276.     The criminal proceedings instituted by or as a result of the acts and omission of Defendants Jimmy Thornton, Christopher Godwin, Andrew Worley and William Brady, terminated in Plaintiff's favor.  The rape and murder charges against

Plaintiff were voluntarily dismissed by the Sampson County District Attorney on March 11, 2021.

277.     The criminal proceedings instituted by or as a result of the acts and omissions of Defendants Jimmy Thornton, Christopher Godwin, Andrew Worley and William Brady, resulted in Plaintiff being wrongfully arrested and imprisoned on May 6, 2014.  Plaintiff remained in custody under no bond or under a bond that was outside of his financial ability to pay.  Eventually, Plaintiff was granted pre-trial release, but he was unable to afford the costs associated therewith and was ordered back into custody until such time as his bond was reduced or unsecured.

278.     The Defendants are jointly and severally liable for the malicious prosecution of Plaintiff by Defendants Jimmy Thornton, Chrisotpher Godwin, Andrew Worley and William Brady, which proximately caused damages to Plaintiff in an amount in excess of $75,000.00, to be determined by a jury.

### Count Three
### Civil Conspiracy
### against Thornton, Godwin, Worley and Brady
### (North Carolina Law)

279.     Each and every paragraph of this Complaint is hereby realleged and incorporated by reference as if fully set forth herein.

280.     Defendants Jimmy Thornton, Christopher Godwin, Andrew Worley and William Brady formed an agreement to do an unlawful act or agreed to act in an unlawful way.  Specifically, Defendants Jimmy Thornton, Christopher Godwin, Andrew Worley and William Brady agreed to make false statements to, without

limitation, the Sampson County District Attorney, the North Carolina courts, and the press and the public at large about Plaintiff and the evidence against him, or lack thereof, to avoid civil or administrative consequences for their acts and omissions that caused the wrongful arrest of an intellectually disabled juvenile.

281.     One or more of the conspirators committed overt acts in furtherance of their conspiracy and agreement to make false statements about Plaintiff based on their intention to avoid civil or administrative penalties for the wrongful arrest of an intellectually disabled juvenile.

282.      Defendants Jimmy Thornton, Christopher Godwin, Andrew Worley, and William Brady each committed overt acts in furtherance of their conspiracy and agreement to make false statements about Plaintiff with the intention to avoid civil or administrative penalties for the wrongful arrest of an intellectually disabled juvenile.

283.     As a direct and proximate result of the conspiracy of Defendants Jimmy Thornton, Christopher Godwin, Andrew Worley, and William Brady, Plaintiff has incurred damages in excess of $75,000.00, to be determined by a jury, for which Defendants are jointly and severally liable.

**Count Four**
**Right Against Self-Incrimination under the 5th and 14th Amendments against Worley and Brady**
**(42 U.S.C. § 1983)**

284.     Each and every paragraph of this Complaint is hereby realleged and incorporated by reference as if fully set forth herein.

285.    Defendants William Brady and Andrew Worley deprived Plaintiff Antonio Trey Jones of his constitutional right to due process of law and his right against self-incrimination under the 5th and 14th Amendments of the Constitution of the United States of America by, without limitation, the following acts or omissions:

*Each deprivation individually, together or a combination thereof*

a.  Engaging in a physically and/or psychologically abusive interrogation;

b.  Failing to read *Miranda* warnings to Plaintiff;

c.  Failing to read *Miranda* warnings to Plaintiff's mother;


d.  Failing to ensure Plaintiff's mother was present for the interrogation;

e.  Conducting an interrogation of Plaintiff without adequately and effectively apprising Plaintiff of his rights;

f.  Intentionally isolating Plaintiff from his mother or other adults;

g.  Misleading Plaintiff and his mother about the purpose and scope of the interrogation;

h.  Dissuading Plaintiff's mother or other adults from participating in the interrogation;

i.  Failing to audio record Plaintiff's interrogation;

j.  Intentionally and deliberately choosing <u>not</u> to audio record Plaintiff's interrogation;

k.  Failing to recognize Plaintiff's obvious and apparent intellectual disability;

l.  Willfully and intentionally disregarding Plaintiff's obvious and apparent intellectual disability;

m.  Eliciting a non-voluntary inculpatory statement from Plaintiff;

n.  Conducting an interrogation of Plaintiff without adequate training; and

53

o. As otherwise will be proven through discovery and trial.

286. Plaintiff's non-voluntary statement to Defendants Brady and Worley was used against him at multiple stages of the criminal process, including but not limited to, the magistrate, a probable cause hearing before the North Carolina District Court, Grand Jury proceedings, and in the North Carolina Superior Court.

287. The failure of Brady and Worley to recognize Plaintiff's intellectual disability, or willfully disregard it, and proceed with a physically and psychologically abusive interrogation without a parent or guardian present is egregious and shocks the contemporary conscious. The conduct of Defendants Brady and Worley is especially egregious and reprehensible in that said Defendants continued for years to cling to their incredible claims that on May 5, 2014, and thereafter Plaintiff presented to them as a "normal" 14-year-old boy, thereby causing the continuation of criminal process against Plaintiff and perpetuating the use of non-voluntary self-incriminating statements against Plaintiff.

288. The conduct of Defendants Brady and Worley constitutes objectively unreasonable police misconduct that proximately caused Plaintiff, an intellectually disabled juvenile, to suffer years of unjustified incarceration, extreme emotional distress, confusion, humiliation, embarrassment, developmental delays, and loss of enjoyment of life.

289. The conduct of Defendants Brady and Worley constitutes a deliberate and reckless indifference to the constitutional rights of Plaintiff that proximately caused Plaintiff to suffer damages as described herein.

290. Defendants Brady and Worley were on notice that engaging in such egregious and reprehensible conduct against a juvenile was reasonably likely to lead to a false confession by a child of Plaintiff's age and intellectual ability.

291. As a direct and proximate result of the acts and omissions of Defendants Brady and Worley, Plaintiff has incurred damages in an amount in excess of $75,000.00, to be determined by a jury, for which Defendants are jointly and severally liable.

## Count Five
### Lack of Probable Cause, False Arrest and Unreasonable Seizure under the 4th Amendment
### against Godwin and Brady
### (42 U.S.C. § 1983)

292. Each and every paragraph of this Complaint is hereby realleged and incorporated by reference as if fully set forth herein.

293. Defendants Christopher Godwin and William Brady deprived Plaintiff Antonio Trey Jones of his right against unreasonable seizure and his right to be free from arrest except on probable cause under the 4th Amendment of the Constitution of the United States of America by, without limitation, the following acts or omissions:

*Each deprivation individually, together or a combination thereof*

a. Failing to recognize Plaintiff's obvious and apparent intellectual disability;

b. Willfully and intentionally disregarding Plaintiff's obvious and apparent intellectual disability;

c. Callously and intentionally failing to follow-up or investigate Plaintiff's recantation of his inculpatory statement;

55

d. Failing to disclose the significant and material exculpatory aspects of Plaintiff's statement to the magistrate or by providing false and/or misleading information to the magistrate;

e. Failing to disclose the significant and material exculpatory aspects of Plaintiff's statement to the Sampson County District Attorney or by providing false and/or misleading information to that office;

f. Failing to disclose the significant and material exculpatory aspects of Plaintiff's statement to the North Carolina courts or by providing false and/or misleading information to the courts;

g. Failing to disclose the significant and material exculpatory aspects of Plaintiff's statement to the Grand Jury or by providing false and/or misleading information to the Grand Jury;

h. Failing to disclose Plaintiff's intellectual disability to the magistrate;

i. Failing to disclose Plaintiff's intellectual disability to the Sampson County District Attorney;

j. Failing to disclose Plaintiff's intellectual disability to the North Carolina courts;

k. Failing to disclose Plaintiff's intellectual disability to the Grand Jury;

l. Failing to reflect, deliberate or otherwise exercise unhurried judgment before charging Plaintiff with rape and murder;

m. Failing to act as reasonably prudent and cautious officers;

n. Maliciously and intentionally taking actions that reasonable law enforcement officers would not have taken under the same or similar circumstances; and

o. As otherwise will be proven through discovery and trial.

294. Defendants Godwin and Brady had obvious reason to doubt the accuracy of the information they provided to the magistrate, the Sampson County District

Attorney, and the North Carolina courts, due to Plaintiff's age, intellectual disability, and the factual inaccuracy of his statement to their investigation.

295.    On an objective basis, it was or should have been obvious to any reasonable officer in the shoes of Defendants Godwin and Brady, that a warrant should <u>not</u> be sought against Plaintiff for the rape and murder of McKenzie considering Plaintiff's age, intellectual disability, and factual inaccuracy of his statement.

296.    Defendants Godwin and Brady deprived Plaintiff of his protections under the 4th Amendment by knowingly and recklessly obtaining a warrant against him through material omissions that, if included, would have vitiated probable cause as described herein.

297.    By virtue of Defendants' direct contact with Plaintiff wherein Plaintiff's intellectual disability manifested itself in an obvious and apparent manner, Defendants Godwin and Brady possessed a high degree of awareness of the probable falsity of their representations to judicial officials.

298.    The acts and omissions of Defendants Godwin and Brady constitute objectively unreasonable police misconduct and demonstrate a reckless and deliberate indifference to the constitutional rights of Plaintiff.

299.     The acts and omissions of Defendants Godwin and Brady were material to any and all judicial officers' findings of probable cause against Plaintiff. Defendants proximately caused Plaintiff, an intellectually disabled juvenile, to suffer

years of unjustified incarceration, extreme emotional distress, confusion, humiliation, embarrassment, and loss of enjoyment of life.

300. As a direct and proximate result of the acts and omissions of Defendants Godwin and Brady, Plaintiff has incurred damages in an amount in excess of $75,000.00, to be determined by a jury, for which Defendants are jointly and severally liable.

**Count Six**
**Due Process and Equal Protection under the 14th Amendment**
**against Thornton, Brady, Godwin and Worley**
**(42 U.S.C. § 1983)**

301. Each and every paragraph of this Complaint is hereby realleged and incorporated by reference as if fully set forth herein.

302. Defendants deprived Plaintiff Antonio Trey Jones of his right to due process and equal protection under the law pursuant to the 14th Amendment of the Constitution of the United States of America by, without limitation, the following acts or omissions:

*Each deprivation individually, together or a combination thereof*

a. In all manner as pled under Count Four of this Complaint under subsections (a)-(o);

b. In all manner as pled under Count Five of this Complaint under subsections (a)-(o);

c. By intentionally treating Plaintiff differently than other juveniles because of his intellectual disability;

d. By departing from the normal procedure to interrogate a juvenile with an adult present;

58

e. By departing from the normal procedure to audio record the juvenile interrogation;

f. By agreeing and conspiring with each other to make false or misleading statements to the Sampson County District Attorney;

g. By agreeing and conspiring with each other to make false or misleading statements to the North Carolina courts;

h. By agreeing and conspiring with each other to make false or misleading statements to the press and the public;

i. By perpetuating the criminal prosecution against Plaintiff after DNA analysis exculpated him;

j. By failing to intervene to protect the constitutional rights of Plaintiff;

k. By acts or omissions that Defendants knew to be unlawful or did not reasonably believe to be lawful; and

l. As otherwise will be proven through discovery and trial.

303. At all times relevant to this action, Defendants knew or should have known that information possessed by them would support a dismissal of the charges against Plaintiff, and that concealing or failing to disclose such information to others would lead to the further wrongful confinement of Plaintiff and the continued prosecution of him by the Sampson County District Attorney.

304. During such time as the North Carolina State Laboratory was issuing DNA and forensic analysis reports exculpating Plaintiff and inculpating others, Plaintiff continued to suffer in juvenile detention, under pre-trial release, or in jail, and under threat of a lengthy prison sentence for a rape and murder he did not commit due to the acts and omissions of Defendants.

305. Defendants' concealment of significant and material exculpatory information about Plaintiff's intellectual disability and inconsistent non-voluntary statement deprived Plaintiff of his constitutional right to meaningful and effective access to the courts, caused a continued deprivation of liberty, and perpetuated the criminal prosecution against him.

306. It is further alleged that Defendants Jimmy Thornton, William Brady, Christopher Godwin and Andrew Worley intentionally treated Plaintiff differently than similarly situated juveniles because of his intellectual disability and there was no rational basis for Defendants' discriminatory acts.

307. Defendants Brady and Worley specifically, acted with discriminatory animus when they intentionally and without justification interrogated Plaintiff without his mother present and actively discouraged her from being included in the interrogation after she made several attempts to be involved – and after Plaintiff's obvious and apparent intellectual disability had manifested itself.

308. Defendants Brady, Worley and Godwin acted with discriminatory animus when they repeated their false and incredible claims under oath that Plaintiff appeared to them at all times to be a "normal" teenage boy who showed no manifestations of intellectual disability.

309. Defendants Thornton, Brady, Worley and Godwin acted with discriminatory animus when they held a press conference, each alongside the other, and uttered – or failed to intervene in the uttering of - false and misleading statements that DNA evidence connected Plaintiff to the rape and murder of

McKenzie Sessoms, such statements each Defendant knew or should have known to be false, malicious, reprehensible and shocking and likely to lead to a violation of Plaintiff's rights.

310. Eight months elapsed between the death of McKenzie Sessoms and the interrogation of Plaintiff. Yet, Defendants Brady and Godwin acted with haste in charging Plaintiff, an intellectually disabled juvenile, with the most serious crimes a man can commit in a shocking, reckless and objectively unreasonable manner.

311. Defendants Brady and Godwin violated Plaintiff's right to due process and equal protection when they failed to deliberate or exercise unhurried judgement in assessing the evidence against Plaintiff, an intellectually disabled juvenile. Defendants Brady and Godwin declined the opportunity for calm and reflective deliberation, such acts or omissions being evidence of a discriminatory animus against Plaintiff and a violation of the core constitutional principles of due process and equal protection under the law.

312. The acts and omissions of Defendants constitute objectively unreasonable police misconduct that shocks the contemporary conscious and demonstrates a callous indifference to juvenile rights and the rights of individuals with intellectual disabilities like Plaintiff.

313. As a direct and proximate result of the acts and omissions of Defendants Thornton, Brady, Godwin and Worley, Plaintiff has incurred damages in an amount in excess of $75,000.00, to be determined by a jury, for which Defendants are jointly and severally liable.

**Count Seven**
**Suit on Sheriff's Bond**
**(North Carolina General Statute § 58-76-5)**

314.     Each and every paragraph of this Complaint is hereby realleged and incorporated by reference as if fully set forth herein.

315.     In all actions and conduct set forth herein in all causes of action, the individually named Defendants Thornton, Worley, Brady and Godwin, were acting within the scope and course of their authority as Sheriff or Deputy Sheriff and under color of their Office as Sheriff and Deputy Sheriff and employes of Sampson County and the Sampson County Sheriff's Department.

316.     The actions of each individual Defendant, in each claim for relief described above, constitute misconduct and misbehavior done in violation of their duties as Sheriff or Deputy Sheriff and employees or agents of the Sampson County Sheriff's Department.

317.     Plaintiff is entitled to recover the full amount of the Sheriff's bond as to the claims against each Defendant according to the provisions of N.C. Gen. Stat. § 58-76-5.

**Count Eight**
**Monell Claim and Supervisory Liability**
**against Thornton, Sampson County and Wm. T. Brady**
**(42 U.S.C. § 1983)**

318.     Each and every paragraph of this Complaint is hereby realleged and incorporated by reference as if fully set forth herein.

319.     At all times relevant to this Complaint, Sheriff Jimmy Thornton was a county official and the final policymaker for Sampson County and the Sampson

County Sheriff's Department with regard to all investigative activities conducted within its jurisdiction. Defendant Thornton's actions and omissions during that time set the policy, custom or pattern and practice of Sampson County and the Sampson County Sheriff's Department.

320. As a county official and the final policymaker for Sampson County and the Sampson County Sheriff's Department, Defendant Thornton created, promogulated and maintained - with deliberate and callous indifference - customs or practices which promoted, facilitated, or condoned unconstitutional conduct against juveniles.

321. Defendant Thorton failed to adequately train, supervise, or discipline detectives in connection with fundamental investigative tasks implicating the constitutional rights of juveniles.

322. At all times relevant to this action, Special Agent Brady was acting under color of law for Sampson County, the Sampson County Sheriff's Department, and the North Carolina State Bureau of Investigation.

323. Upon information and belief, Defendant Thornton failed to supervise Special Agent Brady; Lead Detective Godwin failed to supervise Special Agent Brady; and the North Carolina State Bureau of Investigation failed to supervise Special Agent Brady. The failure to supervise Special Agent Brady was an actual and proximate cause of Plaintiff's injuries and damages as pled herein.

324. Upon information and belief, Defendant Thornton failed to control, train, or discipline Defendants Godwin and Worley for the acts, omissions and

objectively unreasonable police misconduct that caused the deprivation of Plaintiff's constitutional rights.

325.     Upon information and belief, Defendant Thornton knowingly acquiesced to, personally participated in, and had actual and constructive notice of, the transactions and occurrences that caused the deprivation of Plaintiff's constitutional rights as described in this Complaint. Further, as described more fully above, the conduct of Defendant Thornton was shocking, reprehensible and demonstrated a reckless and callous indifference to Plaintiff's constitutional rights.

326.     Upon information and belief, the North Carolina State Bureau of Investigation had in place a policy or custom of deliberate or callous indifference to the rights of juveniles that proximately caused the deprivation of Plaintiff's constitutional rights. Defendant William Brady's shocking conduct is evidence of the State Bureau of Investigation's policy or custom of deliberate and callous indifference to the rights of juveniles and the intellectually disabled in North Carolina.

327.     Upon information and belief, each municipal entity and/or law enforcement agency identified herein created, promoted, promogulated and/or maintained a policy that allowed, tolerated or encouraged a "code of silence" among law enforcement officers whereby a deputy, detective or special agent does not intercede or intervene against a fellow officer to prevent a constitutional injury.

328.     Upon information and belief, it was reasonably foreseeable to all municipal entities and/or law enforcement agencies identified herein that their policy or custom of deliberate or callous indifference to the rights of juveniles would cause

the deprivation of Plaintiff's constitutional rights. Further, it is alleged that each municipal entity and/or law enforcement agency was on notice of the risk of injury to juveniles by virtue of said policy or custom, that each municipal entity and/or law enforcement agency disregarded such risk, and that Plaintiff's injury was the actual and foreseeable result of the reckless disregard of such risk.

329.    As a direct and proximate result of the acts and omissions of each municipal defendant and/or law enforcement agency, Plaintiff has incurred damages in an amount in excess of $75,000.00, to be determined by a jury, for which Defendants are jointly and severally liable.

<u>**Count Nine**</u>
**Intentional Infliction of Emotional Distress**
**against Thornton, Godwin, Worley and Brady**
**(North Carolina Law)**

330.    Each and every paragraph of this Complaint is hereby realleged and incorporated by reference as if fully set forth herein.

331.    As set forth above, Defendants engaged in extreme and outrageous acts and omissions by, without limitation, causing Plaintiff to make a non-voluntary false confession, arresting Plaintiff without probable cause, withholding exculpatory information, and lying about evidence, which exceeded all bounds usually tolerated by decent society.

332.    Defendants' conduct was intended to cause or was recklessly indifferent to the likelihood it would inflict severe emotional distress on Plaintiff.

333.    Defendants' conduct did inflict severe emotional distress upon Plaintiff.

65

334. By reason of the intentional infliction of emotional distress by Defendants, the Plaintiff has been damaged and is entitled to recover damages from Defendants in an amount in excess of $75,000.00, in an amount to be determined by a jury, for which Defendants are jointly and severally liable.

## Count Ten
### Conspiracy to Interfere with Civil Rights
### against Thornton, Brady, Godwin, and Worley
### (42 U.S.C. § 1985)

335. Each and every paragraph of this Complaint is hereby realleged and incorporated by reference as if fully set forth herein.

336. Defendants Jimmy Thornton, William Brady, Christopher Godwin and Andrew Worley did knowingly and intentionally combine, conspire, and agree with each other to engage in a common and unlawful plan to deprive Plaintiff of equal protection under the laws.

337. The unlawful acts and omissions of Defendants to deny Plaintiff equal protection under the law were motivated and aroused by invidious discriminatory animus against Plaintiff based on his status as an intellectually disabled juvenile.

338. The Defendants shared the same conspiratorial objective and acted in furtherance of their objective when each defendant, without limitation, agreed or conspired not to disclose Plaintiff's obvious and apparent intellectual disability to others and agreed and conspired to utter, or fail to intervene in the uttering of, false and misleading statements about Plaintiff to others.

339. As a direct and proximate result of the conspiracy, Plaintiff has been damaged and is entitled to recover damages from the Defendants in an amount in excess of $75,000.00, to be determined by a jury, for which Defendants are jointly and severally liable.

## Count Eleven
## Punitive Damages

340. Each and every paragraph of this Complaint is hereby realleged and incorporated by reference as if fully set forth herein.

341. As a direct and proximate result of the egregious, shocking, reckless, intentional and willful conduct of Defendants, as well as their conscious disregard of the rights and well-being of Trey Jones, and other juveniles in the Sampson County and the State of North Carolina as alleged herein, Plaintiff is entitled to recover punitive and exemplary damages under both federal and state law to punish Defendants for their reprehensible, wrongful, reckless, willful and wanton misconduct and to deter such conduct by others.

342. Plaintiff is entitled to recover punitive damages from Defendants, jointly and severally, in an amount to be determined by a jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays the Court for the following relief:

1. That Plaintiff have and recover of Defendants, jointly and severally, an amount later to be determined at trial and exceeding the jurisdictional limit of this Court for the damages caused to Plaintiff;

2. That Plaintiff have and recover of Defendants, jointly and severally, an amount later to be determined at trial and exceeding the jurisdictional limit of this Court for punitive and exemplary damages;

3. That all issues of fact be tried by a jury;

4. That Plaintiff recover from Defendants, jointly and severally, the costs of this action and reasonable attorney's fees to the fullest extent allowed by the laws of North Carolina and the United States; and

5. That Plaintiff be granted all other legal and equitable relief which the Court deems fair and just.

This the 19th day of December, 2023.

/s/ Patrick R. Anstead

By: _____

Patrick R. Anstead
The Richardson Firm, PLLC
455 Ramsey Street
Fayetteville, North Carolina 28301
Telephone: (910) 488-5050
Facsimile: (910)
patrick.anstead@therichardsonfirm.com
N.C. State Bar No.: 48259
*Attorney for Plaintiff*

68