**EXHIBIT 1**

William Brady 5-28-25

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CASE NO. 7:23-CV-01676-FL

ANTONIO TREY JONES, by and )
through his Guardian Ad Litem, )
CHARLES M. BRITTAIN III, )
                                )
                Plaintiff,      )
                                )
vs.                             )
                                )
JAMES THORNTON, et al.,         )
                                )
                Defendants.     )
---------------------------------

V I D E O T A P E D

D E P O S I T I O N

O F

W I L L I A M

B R A D Y

In Raleigh, N.C.        Reported by:
May 28, 2025            Peter J. Wylie

2

A P P E A R A N C E S:

For the Plaintiff:        Mr. Robert H. Jessup
                          Howard Stallings Law Firm
                          5410 Trinity Road, Suite 210
                          Raleigh, North Carolina 27607

                          Mr. Patrick R. Anstead
                          The Richardson Firm
                          455 Ramsey Street
                          Fayetteville, North Carolina 28301

For the Defendants:       Mr. F. Marshall Wall
                          Cranfill Sumner LLP
                          P.O. Box 27808
                          Raleigh, North Carolina 27611

                          Mr. John Locke Milholland IV
                          North Carolina Department of Justice
                          114 W. Edenton Street
                          Raleigh, North Carolina 27603

                          Mr. Paul Allen
                          County Attorney, Sampson County
                          406 County Complex Road
                          Clinton, North Carolina 28328

                          Mr. Bryan G. Nichols
                          Deputy General Counsel
                          NC State Bureau of Investigation
                          3320 Garner Road
                          Raleigh, North Carolina 27610

The Videographer:         Mr. Corey Parker

In Attendance:            Ms. Lillie Quinn

3

E X A M I N A T I O N   I N D E X

| Examination | By Whom | Page No. |
|---|---|---|
| Direct | Jessup | 8 |

6

1                    S T I P U L A T I O N S

2          It is hereby stipulated and agreed between the

3    parties to this action, through their respective counsel of

4    record:

5          (1)  That the videotaped deposition of WILLIAM BRADY

6    may be taken on May 28, 2025, beginning at 9:36 A.M. at the

7    North Carolina Department of Justice, located at 114 W.

8    Edenton Street, Raleigh, North Carolina 27603, before Peter

9    J. Wylie, a Notary Public.

10         (2)  That the deposition shall be taken and used as

11   permitted by the applicable Federal Rules of Civil Procedure.

12         (3)  That any objections of any party hereto as to

13   notice of the taking of said deposition or as to the time or

14   place thereof, or as to the competency of the person before

15   whom the same shall be taken, are deemed to have been met.

16         (4)  Objections to questions and motions to strike

17   answers need not be made during the taking of this

18   deposition, but may be made for the first time during the

19   progress of the trial of this case, or at any pretrial

20   hearing held before any judge of competent jurisdiction for

21   the purpose of ruling thereon, or at any other hearing of

22   said case at which said deposition might be used, except that

23   an objection as to the form of a question must be made

24   at the time such question is asked, or objection is waived

25   as to the form of the question.

1    (5)  That the witness waives the right to read and

2  sign the deposition prior to filing.

3    (6)  That the sealed original transcript of this

4  deposition shall be mailed first-class postage or

5  hand-delivered.

6    (7)  That the witness was identified by a

7  government-issued photo ID.

8              * * * * *

9  (DEPOSITION EXHIBITS NOS. 4, 5, 7, 9, 10, 14, 15, 22, 23, 25

10     MARKED FOR IDENTIFICATION PRIOR TO TESTIMONY)

11

12

           THE VIDEOGRAPHER:  Good morning.  We're

13     now on the record.  Today's date is Wednesday,

14     May 28th, 2025.  The time is nine-thirty-six A.M.

15           Counsel, please introduce yourselves,

16     after which our court reporter will swear in our

17     witness.

18           MR. JESSUP:  Robert Jessup for the

19     plaintiff.

20           MR. ANSTEAD:  Patrick Anstead for the

21     plaintiff.

22           MR. MILHOLLAND:  Locke Milholland here

23     for the deponent and defendant, William Brady.

24           MR. WALL:  Marshall Wall here for Sheriff

25     Thornton, Sampson County, and Sampson County

Thornton, Sampson County, and Sampson County
Pace Reporting Service     (919) 859-0000     mail@pacereporting.com
Case 7:23-cv-01676-FL    Document 71-1    Filed 09/03/25    Page 5 of 27

8

1       defendants.

2                   MR. ALLEN:  Paul Allen, Sampson County

3           attorney for Sampson County.

4                   MR. NICHOLS:  Bryan Nichols, Deputy

5           General Counsel, North Carolina State Bureau of

6           Investigation.

7   Whereupon,

8                   WILLIAM BRADY,

9               having been first duly affirmed, was

10              examined and testified as follows:

11  DIRECT EXAMINATION BY MR. JESSUP:

12                  THE VIDEOGRAPHER:  Your microphone?

13      Q     Just clip that on your jacket there, sir, about

14            six inches down.  Thank you.

15      A     Is that appropriate?

16      Q     Yes, sir.  Good morning, sir.

17      A     Good morning.

18      Q     Can you start by stating and spelling your full

19            legal name for the court reporter's record?

20      A     William, W-I-L-L-I-A-M, Thomas, my middle name,

21            T-H-O-M-A-S, Brady, B-R-A-D-Y, the Second, Roman

22            numeral, not the number "2."

23      Q     Thank you, sir.  I'm going to start off a little

24            different than I usually do.  I'm going to just

25            ask you, as a law enforcement officer and a BLET

```
 1            just -- they're lesson plans about a specific
 2            topic.  I can't say if they're authoritative or
 3            not.
 4     Q      Well, would you agree that they teach new law
 5            enforcement officers how they should conduct
 6            investigations, and what practices they should
 7            follow?
 8     A      Yeah.  It's more like a guide to me, I would
 9            think.
10     Q      Okay.
11     A      Now, don't get me wrong.  There's some hard and
12            fast rules in there.  But --
13     Q      Okay.
14     A      I mean, there's hard and fast rules through the
15            whole program.
16     Q      We'll come back to some of those things.
17     A      Okay.
18     Q      Have you completed -- well, strike that.
19                 You stated in your interrogatory
20            responses that you've never been demoted,
21            disciplined, or suspended in your law enforcement
22            career; is that correct, sir?
23     A      Yes, best of my knowledge.
24     Q      Okay.  In your discovery production -- and I do
25            not have a printed copy of the additional pages
```

63

| | | |
|---|---|---|
| 1 | | that your counsel produced us last night, because |
| 2 | | I have not been able to get to a printer.  But |
| 3 | | you've had a chance to review -- |
| 4 | A | I looked over it. |
| 5 | Q | Yes, sir. |
| 6 | A | I won't say a deep review, but I looked over it. |
| 7 | Q | I'm handing you what I'm marking as Exhibit No. |
| 8 | | 28, which is the letter we had before last night. |
| 9 | | It's Bates-stamped Pages 6540 to 6542. |
| 10 | | (DEPOSITION EXHIBIT NO. 28 |
| 11 | | MARKED FOR IDENTIFICATION) |
| 12 | Q | Let's talk about this letter.  First of all, who |
| 13 | | is Errol Jarman? |
| 14 | A | The SAC of our district at the time. |
| 15 | Q | Say that again for me, sir.  I'm sorry. |
| 16 | A | The Special Agent in Charge of the district at |
| 17 | | this time.  Not the time of the McKenzie Sessoms |
| 18 | | murder, but at this time of the -- this is a |
| 19 | | memo.  So at the time this memo was written. |
| 20 | Q | And Special Agent in Charge Jarman wrote this |
| 21 | | memo? |
| 22 | A | Yes.  As far as -- yeah. |
| 23 | Q | Okay.  And when did Jarman become Special Agent |
| 24 | | in Charge? |
| 25 | A | I'm not sure.  2015, 2016 maybe. |

1  Q  Okay.  Does this memo refresh your recollection
2     about a meeting that occurred sometime in January
3     of 2018?
4  A  Yeah.  I had forgot about it until I saw that.
5     But yeah, I remember -- I remember the meeting.
6  Q  Tell me what you recall about that meeting, sir.
7  A  Well, in context, in 2017 I had went to my
8     supervisor, who's Lee Newcomb.  His name is
9     listed on this, as well.  And told him that I
10    needed less cases assigned to me so that I can
11    try to catch up on some other cases, specifically
12    some ones that had not been solved.
13        And so I think he had went to SAC Jarman
14    about it, and SAC Jarman, from what Lee Newcomb
15    told me, was basically that -- he basically said,
16    "He can work -- he should work like we assign
17    cases to, he should be able to handle the work."
18    And then I think Newcomb kind of went through
19    some of the cases, and tried to present, you
20    know, "He really is overworked."  And then this
21    was SAC Jarman's response.
22  Q  Who was present at this meeting?
23  A  Me, SAC Jarman, Lee Newcomb.  I believe that's
24    it.  The only reason why I say that is SAC Jarman
25    had a tendency of having every ASAC at meetings,

| | | |
|---|---|---|
| 1 | Q | Those cases, the memo refers to it as an |
| 2 | | attachment, which it calls "Brady 1."  That's the |
| 3 | | document you reviewed before today's deposition, |
| 4 | | the list of cases with things typed out with -- |
| 5 | A | Yeah.  I got -- I got that pretty late.  I |
| 6 | | glanced over it real quick. |
| 7 | Q | Okay. |
| 8 | A | I didn't want to overload myself coming in here, |
| 9 | | and just try to cram stuff in my -- |
| 10 | Q | Was there any specific case or violation listed |
| 11 | | out in that attachment that -- that you believe |
| 12 | | something was recorded that was inaccurate? |
| 13 | A | I didn't go over it with a fine-tooth comb, so it |
| 14 | | would be hard for me to answer that. |
| 15 | Q | Okay.  Sir, do you contest the statement that you |
| 16 | | had numerous and continuous violations of SBI |
| 17 | | policy and procedure? |
| 18 | A | If we're talking about the fifteen-day policy and |
| 19 | | some of the NTDs, then I do not contest that. |
| 20 | Q | Okay.  You acknowledge violating no other SBI |
| 21 | | policies or procedures? |
| 22 | A | There was a five-day policy one time.  I don't |
| 23 | | even think he put that in there.  But there was a |
| 24 | | -- it's our database.  After you get it, you're |
| 25 | | supposed to have five days to submit it back to |

```
 1            your supervisor.  I think he mentioned that.  I
 2            did that.  I violated that, but so did, like,
 3            every other SBI agent.
 4    Q       Okay.
 5    A       So that's not un -- that happens like all the
 6            time.
 7    Q       This memo says you fell, quote, "years behind on
 8            documentation," end quote.  How do you defend
 9            that level of delay?
10    A       Well, it's mostly unsolved, I mean, cases.  And
11            you're continuously getting cases as you're
12            going.  So they're talking about some NTD list.
13            Like some of these cases, I was not even the
14            original agent.  When people retired, I was
15            reassigned their cases.  And they had been
16            unsolved or cold for a while.
17                 Bureau policy wanted us to do something
18            every six months.  That was hard for an agent
19            that was in my shoes, and other agents.  I'm not
20            even saying I'm, you know, individual to that,
21            who had a lot of cases.  It was hard for -- to
22            continue.  I remember being in meetings where
23            some of the other agents were complaining about
24            some of the same things.
25                 So that's a lot what he's talking about,
```

73

```
 1              unresolved stuff in older cases.
 2      Q       Okay.  Did you violate any SBI policies or
 3              procedures in the investigation of McKenzie
 4              Sessoms' homicide?
 5      A       Not that I'm aware of, no.
 6      Q       Okay.  Did you see that case listed in the
 7              Brady 1 attachment?  We don't have the Brady 1
 8              attachment printed because I got it before -- I
 9              was -- last night.  I hadn't been able to get
10              their printer fixed.
11      A       Yeah.  I think I did see that one, and it was
12              something about a synopsis and case notes, which
13              I got in later.  Usually it's the last thing you
14              get in.  I think that was it.
15      Q       Give me just a moment to pull that up on my
16              phone, sir.  Sir, it reads, "Staff inspection on
17              December 10, 2014, indicates several NTDs, which
18              are essentially repeats from September 8, 2014.
19              These have not been completed.  This list
20              includes a cover sheet, synopsis, SBI-4 arrest
21              report, and handwritten notes.  You told me this
22              case has attracted media attention.  It needs to
23              be completed ASAP."
24                       Do you recall what NTDs you did not
25              complete --
```

74

| 1 | A | No. |
| 2 | Q | -- in McKenzie Sessoms' homicide? |
| 3 | A | No.  And most likely they were probably stuff |
| 4 |   | that the sheriff's office had done.  That's |
| 5 |   | usually common when that happens. |
| 6 | Q | Okay.  And I likewise saw this in an e-mail from |
| 7 |   | the DA the night before the suppression hearing |
| 8 |   | where the DA was saying that they didn't have any |
| 9 |   | handwritten notes regarding your interviews, |
| 10 |   | including your interview with Fred Jones, |
| 11 |   | specifically, in that e-mail. |
| 12 | A | And I sent it to him. |
| 13 | Q | Right.  But -- but in twenty -- in December of |
| 14 |   | 2019.  When did -- when did you first take those |
| 15 |   | notes to the Trey Jones 2014 interview, sir? |
| 16 | A | That -- 2014. |
| 17 | Q | Okay.  Why didn't the SBI have them, and why |
| 18 |   | didn't the DA have them until what appears to be |
| 19 |   | 2019? |
| 20 | A | So usually it's the last thing that I submit, is |
| 21 |   | the notes and synopsis, like right before -- not |
| 22 |   | right before trial, but when we know everything |
| 23 |   | is one hundred percent completed. |
| 24 | Q | For those five years before you gave them to |
| 25 |   | anyone else, where were the notes you took of |

| | | |
|---|---|---|
| 1 | | Trey Jones' interview? |
| 2 | A | Probably in my file, most likely. |
| 3 | Q | Where was your file? |
| 4 | A | It was either locked up in my office, or with me. |
| 5 | Q | Okay.  So you just kept those notes yourself, |
| 6 | | those handwritten notes of Trey Jones' interview |
| 7 | | for five years before giving them to the SBI or |
| 8 | | the district attorney's office? |
| 9 | A | Yes. |
| 10 | Q | Is that your usual practice, to keep handwritten |
| 11 | | notes for five years? |
| 12 | A | Well, just until, like, we're -- see, the |
| 13 | | investigation don't stop just because somebody is |
| 14 | | charged. |
| 15 | Q | Sure.  But don't you turn in your handwritten |
| 16 | | notes to someone, the SBI or the DA or somebody |
| 17 | | else involved in the investigation? |
| 18 | A | I mean, sometimes it's done quicker, sometimes |
| 19 | | it's done later. |
| 20 | Q | Is five years an acceptable time period to hang |
| 21 | | onto interview notes, to wait to submit them for |
| 22 | | five years? |
| 23 | A | I mean -- |
| 24 | | MR. MILHOLLAND:  Objection. |
| 25 | A | I don't know how to answer that question.  I |

1             could have turned them in earlier, I guess. But,

2             you know, as far as I'm concerned, when we're

3             getting close to the end of the investigation,

4             that's when they're turned in, that and the

5             synopsis.

6    Q     Well, the SBI policy required you to turn them in

7             within fifteen days, correct?

8    A     Not the notes. That wouldn't be --

9    Q     Well, when were the -- when were the interview

10           notes --

11    A     The interview notes are done at the completion of

12           the investigation.

13    Q     Okay. So you wait to take notes of someone's

14           interview until the completion of the

15           investigation?

16    A     No, no, no. What I -- like, for example, if I'd

17           have done an interview in 2017 or '16, that would

18           have been included in those notes. So that would

19           be at the end of the investigation. So the end

20           of the investigation is when the notes are

21           usually submitted.

22    Q     Okay. We'll talk more about this when we look at

23           the DA's e-mail later. Let me ask you some more

24           questions about this.

25               Sir, at the bottom of Page 1 of Exhibit

83

|     |   |                                                              |
|-----|---|--------------------------------------------------------------|
| 1   |   | at a time, and no more than five cases within a              |
| 2   |   | year." Are those true statements, sir?                       |
| 3   | A | Yes, as far as some of the cases specifically                |
| 4   |   | dealing with reassignment from other agents, and             |
| 5   |   | some of the unsolved cases. That's what I was                |
| 6   |   | referring to. He didn't put that in context, but             |
| 7   |   | that's what I was talking about. And the five                |
| 8   |   | homicide cases in a year, that's absolutely true.            |
| 9   | Q | Okay.                                                        |
| 10  | A | And then the one case at a time, I said would be             |
| 11  |   | ideal. And I don't think he referred to it as                |
| 12  |   | like "ideal," but that's what I said. But five               |
| 13  |   | homicide cases in a year for one person, to be               |
| 14  |   | honest, is probably one too many.                            |
| 15  | Q | Okay. Did you get behind in your investigative               |
| 16  |   | activity on the McKenzie Sessoms murder case,                |
| 17  |   | sir?                                                         |
| 18  | A | Not that I'm aware of, no.                                   |
| 19  | Q | Well, it was listed as one of the cases on Brady             |
| 20  |   | Exhibit 1 to this memorandum, correct?                       |
| 21  | A | I understand. Yeah.                                          |
| 22  | Q | Okay. Was there pressure at this coaching                    |
| 23  |   | session to close some of the cases listed on that            |
| 24  |   | memorandum?                                                  |
| 25  | A | I mean, yes. But this is -- so let me just say               |

1          this.  This was something that I welcomed.  What

2          I didn't welcome was the memo, because other

3          agents had had similar problems.  It's where

4          we're trying to catch up on some unsolved cases,

5          or some cases like this.  He just kind of took it

6          to a different level with the memo.  So I

7          welcomed the time to be able to catch up and

8          close these cases out, some of these unsolved

9          cases, and catch up on some of the paperwork.

10    Q    You needed to close out the McKenzie Sessoms case

11         among others, correct?

12    A    Well, no.  No.  I mean, she -- this had not went

13         to court yet.  Our cases do not close out until

14         it is done with, officially.

15    Q    Well, it was on a list of cases that the -- you

16         were put on desk duty, correct, to figure out a

17         way to close these cases?

18    A    Yeah.  It was supposed to be three months, but

19         that didn't happen.  It ended up being more like

20         a month and a half.

21    Q    How many years were you behind on your cases,

22         sir?

23    A    Well --

24              MR. MILHOLLAND:  Objection.

25    Q    It says here you were years behind on your -- you

```
 1     Q      Right.

 2     A      -- unsolved homicide cases.

 3     Q      That issue goes back to the time that you

 4            interviewed Trey Jones, correct?

 5     A      I don't know.  I don't think so.

 6     Q      Well, you interviewed Trey Jones in 2014,

 7            correct?

 8     A      Right.  This -- this memo is 2018.

 9     Q      And it refers to this issue going back to Janie

10            Sutton's tenure, and Janie Sutton left in 2014,

11            correct?

12     A      I'm not sure.  It's '14 or '15.

13     Q      Okay.  So this issue of running behind on your

14            cases goes back to around the time of Trey Jones'

15            interview, correct?

16     A      That's what SAC Jarman said.

17     Q      Is that correct though?  Is SAC Jarman accurately

18            recording that?

19     A      He's -- he's accurately recording -- I think he's

20            using it as, like, some of the NTDs that weren't

21            done.  Which a lot -- most agents have trouble

22            keeping up with NTDs.  That's -- that's not an

23            uncommon thing.  But that's what he's referring

24            to.  And I know it's kind of hard to explain if

25            you're not in the working environment.  But NTDs
```

1                    are -- can be very difficult on unsolved cases

2                    where you're still getting active cases.

3                          So to answer your question; yeah, there

4                    were NTDs that probably went back in the Janie

5                    Sutton days.  And that's probably what he's

6                    referring to.

7    Q     Okay.  And that would have been the time that you

8                    conducted Trey Jones' interview, correct?

9    A     Yeah.  That would be correct.

10   Q     Okay.  And sir, would you agree with me that when

11                  you're running years behind on your cases, and

12                  you're continuing to get more cases, that there

13                  is pressure to close old cases?

14   A     There's pressure to do the NTDs.  There's not

15                  necessarily pressure to close cases.

16   Q     Well, you read -- you just read this whole

17                  exhibit, correct?

18   A     Yeah.  SAC Jarman, after this came up, wanted me

19                  to close out a bunch of the cases.  But I don't

20                  remember actually getting pressure from my ASAC

21                  saying, "Hey, you need to close these cases."

22   Q     Okay.  Would you agree with me that as a

23                  principal, when you're running years behind on

24                  your cases, there is pressure to close some of

25                  those cases?

1    A    If there's, like, no leads, it's actually kind of
2         difficult to close a homicide case, because of
3         the nature of the crime with the SBI.  They one
4         hundred percent want to make sure that there's
5         nothing else that could be done, compared to,
6         like, a local department that doesn't necessarily
7         have to deal with that.
8    Q    It says here, "A review of SA Brady's case file
9         shows that he has directives that are years old
10        that have not been completed as required.  It is
11        also noted that SA Brady had rejected documents
12        he has not corrected in Infoshare that are over
13        one year old."
14             I'm not quite sure what that lingo means,
15        sir.  What does this mean when it says you have
16        directives that are years old that have not been
17        completed?
18   A    I think he's talking about NTDs.  I don't -- I
19        don't --
20   Q    Things like interviewing suspects, interviewing
21        victims, those type of things?
22   A    Well, it could be anything.  It could be
23        something as simple as not completing an arrest
24        report for the file.
25   Q    Okay.

90

```
 1    A    I mean, I can't answer that without knowing
 2         exactly --
 3    Q    Do you -- did you violate so many policies and
 4         procedures, you can't even remember all your
 5         violations?
 6              MR. MILHOLLAND:  Objection.
 7    A    I can't remember specifics.  Like I did way more
 8         things correctly than I did the violation of the
 9         policy.
10    Q    So you're telling me you followed the policy a
11         little bit more than you violated it?
12    A    Yeah.  The way you worded it --
13              MR. MILHOLLAND:  Objection.
14    A    The way you worded it is like I do it, like, all
15         the time, all the time.  That's not the case.
16    Q    Okay.
17    A    But there is -- did I violate the policy?  Yeah.
18         Most agents did because of the workload.
19    Q    Okay.  So specifically were there times when you
20         wouldn't timely interview victims or suspects?
21    A    No.  Not that I recall.  Victims or suspects?
22    Q    Yeah.
23    A    Not that I recall.  I mean, maybe.  I might have
24         done an oversight, but I don't think so.
25    Q    What is Infoshare?
```

| | | |
|---|---|---|
| 1 | A | That's our database. |
| 2 | Q | Okay.  And were there times you would go over one |
| 3 | | year without putting information in Infoshare? |
| 4 | A | I didn't remember that. |
| 5 | Q | Okay. |
| 6 | A | Now, what he's talking about, there is a |
| 7 | | rejection process.  That means, in context, we -- |
| 8 | | we get a report -- we write a report up.  It goes |
| 9 | | up to records.  Records sends it back to us for |
| 10 | | review.  Then we send it to our supervisor, and |
| 11 | | our supervisor can reject it for any reasons; he |
| 12 | | doesn't like the flow of the report, there might |
| 13 | | be a grammar error, maybe a spelling error.  He |
| 14 | | can reject it.  And then you have to go back into |
| 15 | | it, correct it again, send it back up to |
| 16 | | Infoshare, send it back to you, go back to your |
| 17 | | supervisor for final approval. |
| 18 | Q | Are you supposed to put interview notes in |
| 19 | | Infoshare? |
| 20 | A | Yes. |
| 21 | Q | Okay.  How long did you wait to put Trey Jones' |
| 22 | | interview notes in Infoshare after you conducted |
| 23 | | that interview? |
| 24 | A | I'm not sure of an exact date.  But it was -- it |
| 25 | | was -- |

92

1    Q    Could it have been --

2    A    It was pretty much at the end.

3    Q    Could it have been five years?

4    A    Could have been.

5    Q    And during that time, you showed those notes to

6         no one else?

7    A    No.  I mean, yeah, I sent it to the DA's office.

8    Q    The DA's office, you --

9    A    Prior to the suppression hearing, they got the

10        notes.

11   Q    The night before the suppression hearing?

12   A    That, I don't remember exactly when.  I know I

13        got a call from somebody that said they didn't --

14        they didn't see the notes.  And that could have

15        been an oversight.  I would say before the

16        suppression hearing, I would --

17   Q    So you might have waited four or five years to

18        send the notes to the DA's office?

19   A    I mean, that's what it sounds like.  Yeah.

20   Q    It says here, "In an effort to assist SA Brady

21        with completing past due dictations, some a year

22        or more late, and completing investigative

23        directives resulting from case reviews over the

24        last five years" -- okay, this is being written

25        in 2018, so five years would take us back before

1           MR. MILHOLLAND:  Objection.

2    A     I wouldn't say that.

3    Q     How many times?

4    A     To say that -- I don't know, sir.  I'm not -- I

5          don't want to get caught up on a number without

6          knowing.  I'm just telling you that I had

7          violated the policy in the past.  I admitted that

8          to my SAC, and I'm admitting it here today.

9    Q     And specifically, you violated policies in your

10         investigation of McKenzie Sessoms' homicide,

11         correct?

12   A     I got the notes and a synopsis in later.  I don't

13         know -- I don't think that was a violation of

14         policy.

15   Q     And you sat on Trey Jones' interview notes for

16         years?

17   A     I had it for -- yeah, I had it for a long time.

18         Yeah.

19   Q     Okay.  Did that include the note regarding the

20         recantation made by Trey?

21   A     No.  I don't even think there's a note on that.

22         I just wrote that up in a report.  Because I

23         didn't -- I didn't -- I mean, this was -- this

24         was something that happened quick.  This was not

25         something where I was sitting down, like this

1               right here.  We were getting ready to leave when

2               I heard this.  So I -- I -- I wrote that because

3               I didn't want to hide anything.  That's what she

4               said.

5    Q      How many years did you wait to give that report

6               to anyone regarding Trey's recantation?

7    A      I -- I don't know.

8    Q      Do you know how many years Trey Jones had been

9               incarcerated at the point that you gave that

10             report to someone?

11   A      No, I do not, because it was my understanding he

12             was -- and I don't know.  I wasn't part of his

13             detainment.  But it was my understanding he was

14             in, then he got released, and then he went back

15             in for some reason, which I had heard had

16             something to do with violence against his mother.

17             But I don't know if that's true or not.

18   Q      All right, sir.  I'm handing you what I'm marking

19             as Exhibit No. 29.

20               (DEPOSITION EXHIBIT NO. 29

21              MARKED FOR IDENTIFICATION)

22                 MR. MILHOLLAND:  Are we getting ready to

23             switch topics?

24                 MR. JESSUP:  Sort of.  Sort of same

25             topic, but --

| | | |
|---|---|---|
| 1 | Q | Okay.  When did you first tell anyone about the |
| 2 | | recantation? |
| 3 | A | Oh, I'm sure I told the district attorney's |
| 4 | | office about it. |
| 5 | Q | Well, you were -- you were on the phone with |
| 6 | | Godwin that day while you were out there at |
| 7 | | Trey's house, right? |
| 8 | A | Yes. |
| 9 | Q | Did you tell Godwin, when you were talking to him |
| 10 | | that day on the phone, that Trey had recanted? |
| 11 | A | I'm not sure. |
| 12 | Q | You're not sure?  Well, you talked to Robbie |
| 13 | | Thigpen, the district attorney, that day while |
| 14 | | you were outside of Trey's house, didn't you? |
| 15 | A | Yep. |
| 16 | Q | Did you tell District Attorney Thigpen that Trey |
| 17 | | had recanted? |
| 18 | A | I'm not sure.  That was -- I talked to so many |
| 19 | | people about so many things after that interview. |
| 20 | Q | Who did you tell that Trey had recanted before |
| 21 | | the day of Trey's arrest on May 7th, 2014? |
| 22 | A | I'm not sure, sir. |
| 23 | Q | Did you tell anybody, sir? |
| 24 | A | I'm not sure, sir. |
| 25 | Q | When did you first give a copy of this note to |

350

STATE OF NORTH CAROLINA

COUNTY OF CHATHAM

    I, Peter J. Wylie, a Notary Public in and for the State of North Carolina, duly commissioned and authorized to administer oaths and to take and certify depositions, do hereby certify that on May 28, 2025, WILLIAM BRADY, being by me duly affirmed to tell the truth, thereupon testified as above set forth as found in the preceding 349 pages, his examination being reported by me verbatim and then reduced to typewritten form under my direct supervision; that the foregoing is a true and correct transcript of said proceedings to the best of my ability and understanding; that I am not related to any of the parties to this action; that I am not interested in the outcome of this case; that I am not of counsel nor in the employ of any of the parties to this action, and that signature of the witness was waived.

    IN WITNESS WHEREOF, I have hereto set my hand, this the 16th day of June, 2025.

_____

Notary Public

Certificate No. 202221000213